THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM T. SHUGARTS,              Civil Action No. 04-10J

           Plaintiffs,

    v.                       **JURY TRIAL DEMANDED**

CAPTAIN JAMES TRIPP,
Commanding Officer Troop C       Electronically Filed
Punxsutawney Division of the State
Police; CAPTAIN ROBERT B. TITLER,
Disciplinary Officer, Pennsylvania State
Police; CYNTHIA L. TRANSUE, Deputy
Commissioner of Administration of the
Pennsylvania State Police Department;
and COL. JEFFREY B. MILLER,
Commissioner of State Police,

           Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

AND NOW comes the Plaintiff, William T. Shugarts, by and through his counsel,

Edward A. Olds and Richard Matesic, and files the within Plaintiff's Brief In Opposition

To Defendants' Motion For Summary Judgment:

**I.      Statement of the case**

Trooper William T. Shugarts (hereinafter, "Trooper Shugarts" or "Shugarts") filed

this cause of action pursuant to 42 U.S.C. §1983, alleging retaliation in violation of the

First Amendment and denial of Equal Protection by the defendants.  The summary

judgment record shows that Trooper Shugarts claims were timely filed, that he can

establish his claim for retaliation for the exercise of his First Amendment Right to free

speech, that he can establish his claim for denial of Equal Protection and that he is

1

entitled to prospective relief in the form of reinstatement as a member of the Pennsylvania State Police (hereinafter, "PSP.").

## II.     Factual background

A Counterstatement of Material Facts Not In Dispute (hereinafter, "CSMF") is being filed simultaneously with this brief and is incorporated herein by reference.

## III.    Argument

### A.     Summary judgment in an employment discrimination case is rarely appropriate.

Summary judgment in an employment discrimination case is proper only if the employer persuades the court that no reasonable jury could find in the plaintiff's favor, even if all the inferences that could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff.  **Marzano v. Computer Science Inc.**, 1996 U.S. App. LEXIS 18933 at *10-11 (3d Cir. July 31, 1996), **citing Sorba v. Pennsylvania Drilling Co., Inc.**, 821 F.2d 200, 201-02 (3d Cir. 1987), **cert denied**, 484 U.S. 1019, 108 S.Ct. 730 (1988).

This burden remains with the employer, as the moving party, regardless of which party would have the burden of persuasion at trial.  **Aman v. Cort Furniture Rental Corp.**, 85 F.3d 1074, 1080 (3d Cir. 1996).

When determining whether the moving party has proven the absence of a genuine material issue of fact, the facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true, and "the inferences

to be drawn from the underlying facts <u>must</u> be viewed in the light most favorable to the party opposing the motion." **<u>Aman</u>**, 85 F.3d at 10800-81.  Indeed, <u>any doubt</u> about the existence of a genuine issue for trial should be resolved against the moving party.  **<u>Id.</u>**  Thus, if there is <u>any evidence</u> in the record, from any source from which a reasonable inference in the nonmoving party's favor can be drawn, summary judgment is improper.  **<u>Id.</u>**, 85 F.3d at 1081 (emphasis added).

A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent.  **<u>Lynch v. City of Philadelphia</u>**, 166 F.Supp.2d 224, 228-229 (E.D.PA 2001).  The court's inquiry at the summary judgment stage is the threshold inquiry of determining whether there is need for a trial, that is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. **<u>Id.</u>**; see also, **<u>Anderson v. Liberty Lobby, Inc.</u>** At 250-252.  If there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of plaintiff, that is enough to thwart imposition of summary judgment.  **<u>Lynch</u>**, 166 F.Supp.2d at 228-229.

With particular regard to employment discrimination cases, the Third Circuit has recognized that courts should properly apply a relaxed evidentiary standard because of the difficulty of adducing circumstantial evidence of discrimination.  Thus, the Third Circuit has repeatedly admonished that, due to the particular evidentiary hurdles confronting plaintiffs in employment discrimination cases, where direct evidence of discrimination is largely nonexistent, courts are to be particularly suspicious of requests

3

to exclude evidence on the basis of relevance:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario . . . What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other incidents . . . In many respects, the facts of this case represent what has become the typical Title VII employment discrimination case of this decade.   Anti- discrimination laws and lawsuits have "educated" would-be violators such that extreme manifestations of discrimination are thankfully rare.   Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.   It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior.   In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind.   As one court has recognized, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.   "Title VII tolerates no racial discrimination, subtle or otherwise.". . .  The sophisticated would-be violator has made our job a little more difficult.  ***Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance or excessive mistrust of juries.***"

**Aman v. Cort Furniture Rental Corp.**, 85 F.3d 1074, 1081-82 (3rd Cir. 1996)(citations omitted); see also, **Goosby v. Johnson & Johnson Medical, Inc.**, 228 F.3d 313 (3rd Cir. 2000)(recognizing that employer may attempt to cloak discriminatory conduct in guise of neutral application of highly subjective (and thus suspect) criteria).

**B.**     **Plaintiff's claims are not time-barred**

Defendants carefully segregate the termination of Trooper Shugarts into a plethora of component parts which they mislabel as "discrete acts" in order to argue that Trooper Shugarts' claims are time-barred pursuant to **National Railroad Passenger Corp. v. Morgan**, 536 U.S. 101 (2002) and **O'Connor v. City of Newark**, 440 F.3d 125,128(3d. Cir. 2006).   Contrary to defendants' assertions, however, a forest is it's trees, and neither  **Morgan** nor **O'Connor** serves as a bar to recovery in the case *sub judice*.  In fact, the list of "discrete acts" contained in **Morgan** and **O'Connor** emphasize that Trooper Shugarts complaint was timely filed.

In **Morgan**, the Supreme Court held that  "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice[,]'" for which an employee must file a complaint within the appropriate time period.  **Morgan** at 114.  The **Morgan** Court noted that "[t]here may be circumstances where it will be difficult to determine when the time period should begin to run."  **Morgan** at 114, n. 7. However, the **Morgan** Court recognized  that "[d]iscrete acts such as *termination*, failure to promote, denial of transfer, or refusal to hire are easy to identify."  **Morgan** at 114 (emphasis added).

In **O'Connor**, the Third Circuit applied the **Morgan** analysis to §1983 claims. While also recognizing "termination" amongst the list of "discrete acts," the **O'Connor** Court further held that for an allegation to constitute a discrete act it must "[give] rise to a cause of action at the time it occurred."  **O'Connor** at 129.  Thus,  **Morgan** and **O'Connor** merely reaffirm the proposition that "discrete acts that fall within the statutory

5

time period do not make timely acts that fall outside the time period." **Morgan** at 112

**_citing_ United Air Lines, Inc. v.** Evans, 431 U.S. 553 (1977).  Nothing in the decisions

serves to segment a particular "discrete act" into its component parts.

Courts have also required that a  party exhaust his administrative remedies

before filing a §1983 claim.  **Romero-Ostolaza v. Ridge** 370 F.Supp. 2d 139, 149

(D.DC 2005).  It is axiomatic that a party cannot begin to exhaust his administrative

remedies to contest a wrongful termination  until the party is actually terminated and,

likewise, that a party cannot bring a cause of action for personal injury under

Pennsylvania Law until an injury actually occurs.   Here, Trooper Shugarts could assert

no cognizable claim until such time as he was actually terminated.   Therefore, under

**Morgan** and **O'Connor**, Trooper Shugarts was required to file his complaint within two

years of the date he was terminated because the statute of limitations for §1983 claims

is governed by the state's statute of limitations for personal injury. Defendants' admit

that his complaint was so filed. However, defendants then try to eviscerate the Supreme

Court's definition of a "discrete act" by looking at each element of the termination

procedure in a vacuum and bifurcating the reasons for the termination from the

termination itself, thus rendering the _actual termination_ a mere formality for which there

is no redress.  This is not and cannot be the law.

Statutes of Limitations serve as a shield to "protect defendants and the courts

from having to deal with cases in which the search for truth may be seriously impaired

by the loss of evidence, whether by death or disappearance of witnesses, fading

memories, disappearance of documents, or otherwise."  **United States v. Kubrick**, 444

6

U.S. 111, 117 (1979).  These concerns cannot logically be implicated in the midst of the termination procedure without rendering the termination itself invalid.  Because Trooper Shugarts could assert no cognizable claim until such time as he was actually terminated, the "discrete act" of  termination *must* include the entire termination process.  To hold otherwise produces an absurd result.

For instance, under the defendants reading of **Morgan** and **O'Connor**, an employer could effectively insulate itself from liability by simply waiting two-years and one day after making the decision to wrongfully terminate an employee for engaging in protected conduct before *actually* terminating the employee.[1]  Under defendants' proffered analysis of **Morgan** and **O'Connor**, the employee's redress would be limited to that discriminatory intent encompassed solely in the act of receiving a notice of termination.  In effect, defendants ask this Court to sharpen the Statute of Limitations shield into a crude shank by which Trooper Shugarts' termination can be dissected into the "reasons" for the termination - for which he can seek no relief - and the perfunctory act of termination itself - which is thus beyond reproach.  This was not the Supreme Court's intent and it is not the law.

However, *assuming arguendo* that Defendants tortured interpretation is correct, **Morgan** made clear that a statute of limitations cannot "bar an employee from using the prior acts as background evidence in support of a timely claim."  **Morgan** at 113.  In addition, the summary judgment record makes clear  that Defendant Titler's practical

---

[1]  At least with these defendants, that possibility is not far-fetched. These Defendants actually left open an investigation of Trooper Shugarts for a period of twenty months without taking any action. **CSMP, ¶72.**  Under defendants' theory, they could have immediately terminated the defendant at that time with impunity.

control over the discipline of members extended beyond his recommendation to the Commissioner and did not effectively end until the exhaustion of the administrative remedies.

For instance, when recommending the punishment to be meted out against an offending trooper, Defendant Titler would routinely fail to inform his supervisors of circumstances which would suggest a mitigation of the discipline was proper. **CSMF ¶¶ 5, 12-16.** Defendant Transue provided substantial testimony that, while she was Defendant Titler's immediate supervisor, he consistently failed to adequately inform her of all the relevant factors necessary for her to make a meaningful review of his recommendation, instead providing her only with that information he wanted her to know. **CSMF ¶¶12-16.** These omissions served to artificially buoy Titler's recommended discipline as proper and ensure that his recommendations would not be overturned by his superiors. Here, Defendant Titler failed to provide to his supervisor any mitigating factors for Trooper Shugarts, even though mitigators existed. **CSMF ¶¶ 83-84.** Even under defendants' analysis, this would constitute a "discrete act."

Additionally, following termination, a member had the right to proceed to a court-martial or utilize the grievance procedure to contest the propriety of the discipline. **CSMF §I.** Oftentimes, the Department and the member would reach a pre-arbitration settlement which served to lessen the penalty and avoid arbitration. **CSMF ¶2.** Defendant Titler served on the grievance committee and possessed what was tantamount to unfettered discretion in entering into pre-arbitration settlements. **Titler at 62, 168-169.** He regularly agreed to such settlements in cases involving far worse

8

conduct than that alleged against Trooper Shugarts. *See generally,* **CSMF ¶25.**  In the case *sub judice*, however, Defendant Titler would neither discuss nor consider a pre-arbitration settlement for Trooper Shugarts. **CSMF ¶88**.  Even under defendants' analysis, this would constitute a "discrete act."

Additionally, Defendant Titler provided testimony against Trooper Shugarts at the arbitration hearing wherein he further asserted his pretextual reasons for  Trooper Shugarts termination and testified regarding the discipline record of Trooper Shugarts, which included the improper discipline of Trooper Shugarts for the Barilar Incident. **CSMF ¶88**.  A reasonable jury could infer that Defendant Titler's testimony at Trooper Shugarts' arbitration hearing  was calculated to ensure that Trooper Shugarts' dismissal would be upheld as punishment for testifying against Lt. Barilar in a criminal proceeding.  Even under defendants' analysis, this would constitute a "discrete act."

Logic dictates that the discrete act of "termination" encompasses the entire termination procedure and that an employer cannot improperly segregate aspects of the termination which would not, in and of themselves, give rise to a cause of action in order to color the segregated aspects of the termination as "time-barred, 'discrete acts'" for which there is no redress. The Third Circuit recognized this in  **O'Connor** when it stated that a "discrete act" is an act which "gave rise to a cause of action at the time it occurred."  **O'Connor** at 129.   However, even under Defendants' strained reading of **Morgan** and **O'Connor**, Defendant Titler's "discrete acts" within the limitation period were many, as his power and influence extended far beyond his recommendation to the commissioner, through the arbitration process and well within the two-year tolling

period.

C.     **Trooper Shugarts has stated a claim for retaliation**

1.     **Trooper Shugarts' testimony against Lieutenant Barilar is protected speech**.

Defendants' nebulous contention that Trooper Shugarts testimony against Lieutenant Barilar is not protected speech lacks merit as "it is well established [that] public employers cannot condition public employment on a basis that infringes an employee's constitutionally protected interest in free expression." **Swineford v. Snyder County Pennsylvania**, 15 F.3d 1258, 1269 (3d Cir.  1994).

For a public employee's speech to be protected speech, it must be on a "matter of public concern."  **Lynch v. City of Philadelphia**, 166 F.Supp. 2d 224, 229 *citing* **Watters v. City of Philadelphia**, 55 F.3d 886, 892 (3d Cir.  1995). *Accord,*  **Jones v. Indiana Area School District**, 397 F.Supp.2d 628, 652 (W.D.PA 2005).   "A public employee's speech will be considered a 'matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concerns to the community.'" **Lynch** at 229 *citing* **Green v. Philadelphia Hous. Auth.**, 105 F.3d 882, 886 (3d Cir.  1997) *quoting* **Connick v. Myers**, 461 U.S. 138, 146 (1983).  *Accord*, **Jones** at 652.

"In **Pro v. Donatucci**, 81 F.3d 1283, 1290-91 (3d. Cir.  1996), the Third Circuit found that a public employee's appearance in court pursuant to a subpoena was a matter of public concern."  **Lynch** at 229.  Clearly Trooper Shugarts' testimony in a criminal proceeding against Lt. Barilar pursuant to a subpoena falls squarely within the

10

definition of protected speech.  Additionally, because Trooper Shugarts' testimony against Lt. Barilar was not "pursuant to official duties," defendants' tepid  reliance on **Garcetti v. Ceballos**, __  U.S.  ___, 126 S.Ct. 1951 (2006) is misplaced.

> ## 2.   There is substantial evidence that Shugarts suffered adverse employment action as a result of his testimony.

Defendants are also incorrect in their argument  that Trooper Shugarts cannot offer evidence that he suffered adverse employment action "within the available limitations period."  Def. Brief at 13.  As more fully detailed above, the discrete act of termination is not limited to the act of termination itself, but necessarily encompasses the entire termination process, and while recovery for the discipline specifically imposed for Trooper Shugarts actions in the Barilar Incident may be time-barred, said discipline properly illuminates the pretextual nature of Trooper Shugarts' improper termination. *See*, **Morgan** at 113.  Additionally, it is black letter law that a "plaintiff is entitled to prove his knowledge through circumstantial evidence."  **Lynch** at 231.

In fact, and as stated above, the Third Circuit has recognized that courts should properly apply a relaxed evidentiary standard in employment discrimination cases because of the difficulty of adducing circumstantial evidence of discrimination. **Aman v. Cort Furniture Rental Corp.**, 85 F.3d 1074, 1081-82 (3rd Cir. 1996)(citations omitted); **Goosby v. Johnson & Johnson Medical, Inc.**, 228 F.3d 313 (3rd Cir. 2000).  These concerns retain their vitality even in cases not involving a suspect class.  In **Lynch**, *supra*, a police officer brought a §1983 claim against the City of Philadelphia and Philadelphia Police officials alleging that he was improperly transferred in retaliation for

providing testimony at his subordinates' criminal hearings.  **Lynch** at 227-228.   Similar

to the defendants' arguments here, the defendants in **Lynch** moved for summary

judgment asserting, *inter alia*, that (1) "the Plaintiff has failed to prove the transfer was

motivated by the Plaintiff's protected activity because Defendant Timoney is the person

responsible for the transfer and there is no evidence that Defendant Timoney knew of

the testimony given by the Plaintiff[,]" and (2) "that the Plaintiff would have been

transferred regardless of his testimony and present[ed] evidence of a departmental

restructuring to support this allegation."  **Lynch** at 232.  In denying the motion for

summary judgment, the Court in  **Lynch** allowed the case to proceed to trial because:

> While the Plaintiff may be correct that direct evidence of Defendant
> Timoney's knowledge is lacking, the Plaintiff is entitled to prove his
> knowledge through circumstantial evidence.  As discussed previously, the
> transfer to CIB could reasonably raise an inference that the Plaintiff was
> being disciplined.  In his deposition, Inspector Norris acknowledges that
> the Plaintiff exercised poor judgment in testifying and that they were upset
> that the Plaintiff would testify in a retail theft case. [citations omitted].
> There is also testimony that the Commissioner, Defendant Timoney,
> would solicit and receive information from internal affairs regarding
> personnel before they were transferred. [citations omitted].  ***At the
> summary judgment phase, the Court cannot assess the credibility of
> the evidence.***  Combining the inference of a disciplinary action, the
> displeasure with the Plaintiff's testimony by Internal Affairs Personnel, and
> the fact that the Commissioner gets information from Internal Affairs prior
> to transferring personnel, a reasonable person could find that the transfer
> was motivated by retaliation.
>
> . . .
>
> In addition, even if the restructuring called for a transfer of the Plaintiff
> from MRB, the alleged retaliatory act is not only the transfer from MRB, it
> is the transfer to CIB.  The Plaintiff alleges that the Defendants could have
> transferred him to a more suitable position rather than to what is
> commonly thought of as a punitive position.  This issue is a factual dispute
> which should go to the jury.  **Lynch** at 231-232. [emphasis added].

12

As in **Lynch**, substantial circumstantial evidence exists here which would allow a jury to infer that Trooper Shugarts' termination was in retaliation for his testimony against Lt. Barilar in a criminal proceeding.  Also as in **Lynch**, here "a factual dispute which should go to the jury" exists regarding whether or not the imposed discipline would have been the same absent Trooper Shugarts testimony against Lt. Barilar.  **Lynch** at 232.

The **Lynch** court underscored the importance of witness credibility in determining a motion for summary judgment.  **Lynch** at 231.  The Supreme Court has long recognized that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions[.]" **Anderson v. Liberty Lobby, Inc.** 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).  "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."  **Abraham v. Raso**, 183 F.3d 279, 287 (3d Cir.  1999).  "[T]he mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." **Sartor v. Arkansas Natural Gas Corp.**, 321 U.S. 620, 628, 64 S.Ct. 724, 729 (1944) *citing* **Sonnentheil v. Christian Moerlein Brewing Co.**, 172 U.S. 401, 408, 19 S. Ct. 233, 236.  In the case at bar, the summary judgment record raises substantial questions regarding  Defendant Titler's credibility which casts serious doubt on his testimony regarding the purported basis for the termination of Trooper Shugarts, and therefore precludes an entry of summary judgment against the plaintiff.

Defendant Titler has a long history of lying to his superiors, improperly

supervising his subordinates and misusing and abusing the disciplinary process.  *See*

*generally*, **CSMF §II.**  Additionally, contrary to Defendants' portrayal, Defendant Titler

was not merely an impotent conduit in the termination of Trooper Shugarts, one who

"only made a recommendation of court-martial."  Def. Brief. at 15.  In addition to

wielding powers that can only be described as awesome, Defendant Titler regularly

abused those powers to guarantee that the effects of his abuse would carry through the

arbitration process.  **CSMF ¶4; §II A**.   There is substantial evidence from which a jury

could infer a retaliatory inference on the part of Defendant Titler for the termination of

Trooper Shugarts.  The summary judgment record reveals the following:

a.      That Defendant Titler was well aware of Trooper Shugarts involvement in the Barilar Incident at the time he instituted the discipline of termination. In fact, Trooper Shugarts role in testifying against Lt. Barilar was specifically brought to Defendant Titler's attention prior to his recommending termination.  **CSMF ¶83.**

b.      That Defendant Titler reached out to troop commanders to see if a member facing discipline was a "good guy" and curried favor with other officers, going so far as to offer to mitigate discipline against a member because his supervisor knew the member subject to discipline.  **CSMF ¶¶6, 17-18.**.  Defendant Miller, apparently unaware of Defendant Titler's offer to mitigate the punishment, testified that the Vasquez case represented a clear example of an instance in which a member should face automatic dismissal.  **CSMF ¶18.**

c.      That  prior to the completion of the administrative investigation into the Barilar Incident and prior to Defendant Titler receiving any DARs emanating from the Barilar Incident, several of Lt. Barilar's supervisors had lobbied for Barilar's return to active duty and Defendant Titler was approached for his opinion.  **CSMF ¶60.**

d.      That in an email sent to Defendant Titler and several high ranking officers in the PSP, Captain Brown evidenced a dislike for Trooper Shugarts emanating from the Barilar Incident by stating that Trooper Shugarts had lied during the investigation, even though he had not yet seen the investigative report and even though Trooper Shugarts statements

regarding the incident remained consistent throughout. **CSMF ¶60.**

e.   That there was resentment against Trooper Shugarts for his testimony against Lt. Barilar in a criminal proceeding. **CSMF ¶¶73-74.**

f.   That Defendant Titler commonly reached out to a trooper's troop commander when deciding punishment, but diverged from this practice in deciding to terminate Trooper Shugarts when he never contacted Captain Tripp to solicit his opinion. **CSMF ¶¶6, 84.**

g.   That although discipline of a trooper for alleged criminal conduct was practically limited to that conduct for which there was a finding of guilt, Defendant Titler issued discipline for each offense with which Trooper Shugarts was charged, including for those charges that were dismissed. **CSMF ¶¶79-81, 85.**

h.   That although it was a common practice for Defendant Titler to agree to a pre-arbitration settlement which served to lessen a member's punishment in cases involving dismissal, he neither discussed nor considered a settlement for Trooper Shugarts.  **CSMF ¶¶25, 88.**

i.   That Defendant Titler consistently abused the disciplinary process, selectively presented mitigating and aggravating factors to his supervisors in court-martial cases to ensure his recommendation would stand and lied to his supervisor.  **CSMF §II.**

j.    That Defendant Titler knowingly and willingly participated in a scheme to baselessly target a trooper who had fallen into disfavor with a Major and instituted against said trooper a serious disciplinary penalty, which discipline was later determined to be without merit.  **CSMF ¶¶21-23.**

From this record, a reasonable jury could easily infer that Defendant Titler was

aware of the resentment against Trooper Shugarts emanating from the Barilar Incident,

that Defendant Titler did not believe Trooper Shugarts was a "good guy," that

Defendant Titler believed that several high ranking officers wanted Trooper Shugarts

dismissed because of his testimony in a criminal proceeding against Lt. Barilar, that

Defendant Titler wanted Trooper Shugarts dismissed for those same reasons, that as a

result of this animus,  he failed to consider any mitigating factors on behalf of Trooper

Shugarts and that he took these actions to ensure the effective dismissal of Trooper Shugarts in retaliation for Trooper Shugarts providing testimony against Lt. Barilar in a criminal proceeding.

### D.    Shugarts has stated an Equal Protection claim.

Defendants do not dispute that an Equal Protection claim can be properly maintained by a class of one.  *See*, **Willowbrook v. Olech**, 528 U.S. 562 (2000). Defendants err, however, in their assertion that no fundamental right is impinged and therefore the rational basis rule applies.  "A fundamental right is defined as a right that is explicitly or implicitly guaranteed by the Constitution."  **Raycom National, Inc. v. Campbell**, 361 F.Supp.2d 679, 686 (N.D. Ohio  2004) *citing* **San Antonio Independent School Dist. v. Rodriguez**, 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).  "The right to free speech under the First Amendment is a fundamental right."  **Campbell** at 686 *citing* **Burns v. Bitnar**, 221 F.3d 1333 (6th Cir.  2000).  Trooper Shugarts has alleged that he was fired for exercising his First Amendment Right to free speech by testifying in a criminal proceeding  against a Lieutenant in the Pennsylvania State Police, necessarily implicating the infringement of a fundamental right.  "[W]here the challenged action infringes on fundamental constitutional rights, such as . . . rights protected by the First Amendment[,]" strict scrutiny is properly applied.   **Donatelli v. Mitchell**, 2 F.3d 508, 513 (3rd Cir.  1993) *citing* **Dunn v. Blumstein**, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); **Police Dept. of Chicago v. Mosley**, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972).  Thus, heightened scrutiny is

required in analyzing the defendants' purported reasons for firing Trooper Shugarts.
Even if the rational basis rule applies, however, Trooper Shugarts has stated a claim
that his termination served to deny him equal protection.

As more fully illustrated above, there is vast circumstantial evidence in this case
that would allow a reasonable jury to infer that the termination of Trooper Shugarts was
not rationally related to any legitimate state interest.  Additionally, the summary
judgment record exposed direct proof that the PSP lacked  a rational basis to terminate
Trooper Shugarts.

Initially, the past actions of wrongful discipline, even if outside the Statute of
Limitations period, inform as to the reason behind the discipline for those acts within the
statute.  **Morgan** at 113.  Defendants on one hand ask the court to determine that
recovery regarding punishment related to the Barilar Incident is time-barred, then seek
to use the improper institution of the discipline against Trooper Shugarts related to that
incident as a factor in determining that his termination was rational and therefore
justified.   However, there is almost unanimous agreement that the discipline meted out
regarding the Barilar Incident was improper. **CSMF ¶64**.  In fact, Defendant Titler
testified that the Barilar Incident was one of the reasons why the PSP changed their
disciplinary process to eliminate the option for a troop commander to "sustain and
counsel." **CSMF ¶90**.  Thus, a proper analysis of the propriety of Trooper Shugarts'
termination requires that the Barilar Incident not be considered in weighing the effect
that his prior discipline had on his ultimate termination.  Nevertheless, the punishment
meted out against Trooper Shugarts in the Barilar Incident was a critical factor in his

17

ultimate termination.  In deciding to uphold Trooper Shugarts termination, the arbitrator based her decision in part on Trooper Shugarts prior disciplinary record, including his discipline related to the Barilar Incident. **CSMF ¶88.**

The arbitrator's decision was also based on three violations with which Trooper Shugarts should not have been charged.   Defendant Titler testified that Captain Tripp had the "highest integrity" of any member of the PSP.  **CSMF ¶87.**  Captain Tripp testified that Defendant Titler's determination that Trooper Shugarts violated three of the regulations with which he was charged was wrong.  Captain Tripp testified that he would have charged Trooper Shugarts only with conformance to laws, unbecoming conduct and use of alcohol and would not have charged Shugarts with internal investigations, competency or discrimination or harassment.  **Tripp at 108.**  This clear and direct evidence, combined with the voluminous circumstantial evidence, reveals that not even a rational basis existed to terminate Trooper Shugarts.

Defendants next attempt to deflect an equal protection claim by drawing the class with whom Trooper Shugarts is "similarly situated" so narrowly that they effectively eliminate it, then allege that no other member in the history of the Pennsylvania State Police could possibly be so situated..  However, an "exact correlation is not necessary," and instead, a "rough equivalence" between the plaintiff and the comparator is all that is required. **Perkins v. Brigham & Women's Hospital, et al.**, 78 F.3d 747 (1st Cir. 1996). The test for determining whether a comparator presents a relevant and material comparison is two-pronged:  First, it must be shown that the respective behaviors of the plaintiff and the comparator were of "comparable seriousness."  **Grande v. State Farm**

18

**Mutual Automobile Insurance Co.**, 83 F.Supp.2d 559, 565 (E.D.Pa. 2000).  Second,

the plaintiff need only demonstrate the lack of mitigating or differentiating circumstances

that would either:  (a) distinguish the comparator's conduct from that of the plaintiff, or

(b) justify the employer's disparate treatment of the plaintiff versus the comparator.

**Grande** at 565.

To put it another way, Defendants "misunderstand the relevant legal standard.

Plaintiff need not allege [he] was treated differently than others *identically* situated but

rather that [he] was treated differently from others *similarly* situated."  **Montanye v.**

**Wissahickon School District**, 327 F.Supp.2d 510, 519 (E.D.PA 2004). [emphasis in

original].  In **Montanye**, a special education teacher brought a "class of one"  §1983 suit

against a school district and various school officials alleging that she was disciplined for

her efforts to assist a suicidal special education student in violation of her right to equal

protection.  **Montanye** at 512-517.  In a motion to dismiss, the defendants sought  to

very narrowly define the class of similarly situated individuals as

> any other teacher who: (1) counseled a student and her family, although
> not a guidance counselor or school psychologist; (2) concerning rules at
> home; (3) recommended a psychologist for the student; (4) made
> appointments with the psychologist for the student; (5) transported the
> student to her scheduled sessions with the psychologist in her own
> vehicle; (6) attended the sessions with the student and the psychologist;
> and (7) visited and counseled the student while she was a patient at a
> mental health facility, was subject to treatment different from that which
> plaintiff received, that is, notice to appear at a Loudermill hearing and a
> written directive advising her why the actions detailed were inappropriate
> to her position as a special education teacher and instructed her to refrain
> from these actions in the future.  **Montanye** at 519.

In denying the motion to dismiss, the **Montanye** court found that the defendants'

proffered class was too narrow and agreed with the plaintiff that "the relevant group of

'others similarly situated' are teachers in the School District." **Montanye** at 519.   The

court in **Anderson v. Cornejo**, 284 F.Supp.2d 1008, 1037-38 (N.D. Ill. 2003) also

cautioned against a narrow construction of the "similarly situated" class, stating:

> As to specific similarly situated individuals there is no magic formula for determining whether someone is similarly situated.  This is due, seemingly, to the essentially factual nature of the inquiry.  Different factors will be relevant for different types of inquiries-it would be imprudent to turn a common-sense inquiry into a complicated legal one.  In determining who is similarly situated, we have also been careful not to define the requirement too narrowly.  *See, e.g.,* **Freeman v. Madison Metro. Sch. Dist.**, 231 F.3d 374, 382-383 (7th Cir. 2000); *cf.* **Radue v. Kimberly-Clark Corp.**, 219 F.3d 612, 619 (7th Cir. 2000).  **Chavez**, 251 F.3d at 636.

**Anderson v. Cornejo**, 284 F.Supp.2d 1008, 1037-38 (N.D. Ill. 2003).

Trooper Shugarts suggests that a larger class than that proffered by the

Defendants in fact exists, namely other members of the Pennsylvania State Police.

The class, however, can be more narrowly drawn and still provide for Trooper Shugarts'

equal protection claim.  Deputy Commissioner Brown testified that the PSP recognizes

certain acts of misconduct by its troopers which it deems should result in automatic

dismissal, including:

> theft, gun play, "pointing guns at other members," "integrity, lying during official proceedings when you have an obligation to be truthful."  "sexual misconduct."  "serious acts of sexual misconduct."  "inappropriate touching."  "domestic violence, where the person is in fear of their life."  "driving state car while underneath the influence of alcohol."  "if you're arrested for DUI and it's your second offense off duty, any time during your career, you're dismissed.   DUI with hit-and-run;. "if you're involved in a -- incarcerated where you would lose your CLEAN privileges, like for instance, access to the NCIC CLEAN."  (Commonwealth Law Enforcement Assistance Network.)   "if you lose your operating privileges for more than 180 days . . . drug use. . . . you get a positive drug test, you're dismissed."  and Official oppression.  **Brown at 98-103.**

20

**CSMF ¶91.**

Defendant Titler also testified that misconduct involving domestic violence and theft

resulted in automatic dismissal with no mitigation.  **CSMF ¶25**.  However, with the

exception of Trooper Shugarts, those members who committed infractions which should

have resulted in "automatic dismissal" where not in fact dismissed.  For example:

a.   In the case of Sgt. Lapia, Lapia had sexually assaulted a female corporal. **Transue at 106.**   Lt. Marcy Robinson, the Equal Emloyment Opportunity Officer, reported to Deputy Commissioner Brown that Titler had gone to the Bureau of Human Resources and inquired as to the date when Lapia would have the hours in to qualify for a 20-year retirement. **Transue at 107-108.  Robinson at ___.**   According to Transue, "Had [Titler] imposed discipline at an earlier point in time, it is possible that the member would have been just shy enough hours of employment with the Commonwealth to obtain their 20-year retirement." **Transue at 105-106.**   Titler's actions in allowing Sgt. Lapia to obtain a 20-year retirement were inappropriate. **Conley at 139-140.**

b.   In the case of Matthew Tuzynski (67 of 2000), the trooper was accused of sexual molestation of children**. Titler at 255.**  The recommended penalty was dismissal, but Titler agreed to a pre-arbitration settlement which allowed the trooper to utilize leave in order to qualify for a 20 year retirement**. Titler at 255.**  Titler now admits that this was wrong. **Titler at 255.**

c.   In the case of Roger Smith (1999-116), the trooper was accused of domestic violence against his daughter and threatened to kill the victim. **Titler at 251-252.** Domestic violence against a blood relation supposedly always warranted dismissal. **Titler at 175.**  However, one of Titler's classmates from the police academy was involved in this case. **Titler at 252**.  Titler imposed a five day suspension. **Titler at 251.**

d.   In the case of Trooper Unrue, the trooper had patronized prostitutes on 21 different occasions. **Titler at 256.**  Titler went along with a pre-arbitration settlement reducing the penalty from dismissal to a 45 day suspension. **Titler at 256, 257.**  Titler agreed that the settlement was not proper. **Titler at 257.**

e.   In the case of Trooper Darren Lawrence (2000-83), the trooper entered into a sexual liaison with a confidential informant and took her to a hotel

where undercover drug law enforcement officers were meeting, potentially exposing the undercover officers identities. **Titler at 214-216.** Trooper Lawrence's actions could constitute official oppression and interference with an investigation, but Titler adjudicated a 5 day suspension. **Titler at 215**.

f.      In the case of Trooper Getz, the trooper placed a bet with a bookmaker and took bets with other officers. Lt. Harrison adjudicated dismissal. The case was settled prior to arbitration as a 45 day suspension. Col. Conley believes that Trooper Getz should have been dismissed and that Titler influenced Harrison to agree to the reduced penalty. **Conley at 121-124; Titler at 205-208.**

g.      In the case of Allan Brown, 2000-28, the trooper lied about a towed vehicle and stole beer. Even though Defendant Titler testified that "theft" should result in an automatic dismissal, Brown received a 30-day suspension without pay and was transferred. **Titler at 173-174.**

h.      In the case of Trooper Derosier (2000-136), the trooper knew the whereabouts of an individual subject to an arrest warrant and failed to tell the trooper seeking to execute the warrant. **Titler at 185.** Titler imposed a five day suspension after speaking with the Derosier's commanding officer. **Titler at 184-185, 196.**

I.      In the case of Trooper Fleming (2002-132), the trooper had engaged in harassment and stalking. **Titler at 198.** Fleming assaulted another motorist twice with a closed fist, but the District Attorney declined to prosecute. **Titler at 204**. Aggravating circumstances existed in that the trooper had prior interpersonal problems. **Titler at 201.** Titler spoke with Fleming's commanding officer and was told that Fleming was "trying to turn around." **Titler at 198**. Although the assault on the motorist resulted in somebody outside the department being victimized, Titler asked Fleming's CO to refer him to member's assistance and instituted a 15 day suspension. **Titler at 198, 200, 204.** The suspension was reduced to 8 days pursuant to a pre-arbitration settlement. **Titler at 204.**

j.      In the case of Marc Nickens (2000-135), the trooper threatened to take his weapon into the Lieutenant's office and "blow his head off." **Titler at 223.** Pursuant to a pre-arbitration settlement, the trooper received a 60 day suspension plus a transfer. **Titler at 223.**

k.      In the case of Paul Nieves, the trooper, while off duty, forcibly stopped a vehicle on Interstate 80 in a road rage incident and pulled a gun on the motorist. The victim was not a member of the department. The Trooper

later refused to dismiss the charges against the victim.  Titler issued a 10-day and a 15-day suspension without pay.

**CSMF ¶19-20, 25.**

Even if we limit the cases to those cases involving sexual harassment or improper sexual conduct, the result is the same.  **Id.**  In fact, on September 8, 2003, the Office of The Inspector General issued an Investigative Report On Sexual Harassment And Sexual Misconduct At The Pennsylvania State Police, wherein the OIG found that the State Police do not document all misconduct and that discipline is often minimal, *disparate* and diminished during the grievance process.  **CSMF ¶89**.

Of course, it is not necessary for Trooper Shugarts to prove that he has been treated differently from *every* member of the "similarly situated" class, but only that he has been treated differently from *any* member of the "similarly situated" class.   "The fact that one similarly situated person from the unprotected class was treated the same as a plaintiff does not disprove discriminatory effect, [citation omitted], but one similarly situated person from the unprotected class who was treated differently is enough to satisfy the discriminatory effect requirement[.][citation omitted]" **Anderson v. Cornejo** at 1038.

### E.   Shugarts has properly made a claim for reinstatement.

The Supreme Court of the United States as well as the Third Circuit has long held that an order for prospective relief in the form of reinstatement against a state official sued in his official capacity for violations of constitutional rights pursuant to a policy or custom of the state does not violate the 11th Amendment.  *See,*  **Koslow v.**

**Commonwealth of Pennsylvania**, 302 F.3d 161, 179 (3d Cir.  2002) *citing* **Idaho v. Coeur d'Alene Tribe**, 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

**Melo v. Hafer**, 912 F.2d 628 (3d Cir.  1990) *aff'd* **Hafer v. Melo** 502 U.S. 21, 112 S.Ct. 358 (1991).  In **Melo**, the Third Circuit recognized that  **Will v. Michigan Dept. Of State Police**, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)

> supports maintenance of a <u>section 1983</u> claim against a state official for reinstatement.  The Court, relying again on the Eleventh Amendment, stated that "a State official in his or her official capacity, when sued for injunctive relief, would be a person under §1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" **Melo** *citing* **Will**, 109 S.Ct. At 2311 n. 10 (quoting **Kentucky v. Graham**, 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

"Reinstatement . . . is the type of injunctive, 'forward-looking' relief cognizable under *Ex Parte Young.*"  **Koslow** at 179.  The fact that Defendant Miller was not the Commissioner of the PSP at the time of the Constitutional violations is of no consequence where, as here, the PSP had in force a disciplinary policy that was specifically found by the Pennsylvania Office of the Inspector General to allow for the unfettered institution of disparate discipline, which ultimately resulted in the denial of Equal Protection to Trooper Shugarts.   "Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation."  **Hafer** at 362.  "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in the violation of federal law."  **Hafer** at 362-363 *citing* **Graham** at 166 *quoting* **Monell v. New York City Dept. Of Social Services**, 436 U.S. 658, 694 (1978).   It is clear, that "[t]o the extent that [Trooper Shugarts] complaint seeks

prospective relief against the state officials, therefore, the district court has the power to grant it."  **Laskaris v. Thornburgh** 661 F.2d 23, 26 (3d Cir.  1981).

IV.    **Conclusion**

Pursuant to a subpoena, Trooper Shugarts provided testimony in a criminal proceeding against a Lieutenant in the Pennsylvania State Police charged with intimidation of witnesses and obstructing the administration of law.  For this exercise of his First Amendment right, he suffered retaliation at the hands of Captain Tripp and Defendant Titler which ultimately led to his termination in violation of his right to Equal Protection.  His cause of action was timely filed and the summary judgment record reveals both direct evidence and ample circumstantial evidence which would allow a reasonable jury to infer that Trooper Shugarts was fired for the testimony he provided in a criminal proceeding.  In the event that a jury finds in favor of Trooper Shugarts, the law is clear that he is entitled to reinstatement to his position as a Trooper with The Pennsylvania State Police.  The Defendants' motion for summary judgment should therefore be denied.

Respectfully submitted,

/s/ Richard S. Matesic
Richard S. Matesic
PA ID No. 72211

/s/ Edward A. Olds
Edward A. Olds
PA ID No. 23601

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
412.492.8975

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2007, I electronically filed the foregoing Plaintiff's brief in opposition to defendants' motion for summary judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Scott A. Bradley, Esquire
Gerald J. Pappert, Esquire
Susan J. Forney, Esquire
Office of Attorney General
564 Forbes Avenue
Pittsburgh, PA 15219


/s/ Richard S. Matesic