THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM T. SHUGARTS,                          Civil Action No. 04-10J

                      Plaintiffs,

        v.                                    **JURY TRIAL DEMANDED**

CAPTAIN JAMES TRIPP,                          Electronically Filed
Commanding Officer Troop C
Punxsutawney Division of the State
Police; CAPTAIN ROBERT B. TITLER,
Disciplinary Officer, Pennsylvania State
Police; CYNTHIA L. TRANSUE, Deputy
Commissioner of Administration of the
Pennsylvania State Police Department;
and COL. JEFFREY B. MILLER,
Commissioner of State Police,

                      Defendants.

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Plaintiff, William T. Shugarts, by and through his counsel, Edward A. Olds and Richard Matesic, files the within Plaintiff's Counterstatement of Material Facts Not In Dispute in support of his Brief In Opposition to Defendants' Motion for Summary Judgment.

**I.      The Pennsylvania State Police Discipline Process**

1.       Defendants' description of the discipline process during the relevant time period contained  in their Statement of Material Facts Not In Dispute is substantially accurate, with a few notable exceptions. **Defendants' Statement of Material Facts Not In Dispute (DSMF) at 4-8.**

2.      First, Defendants minimize Defendant Titler's influence following his recommendation to the Deputy Commissioner of Administration in court-martial cases. **Id. at ¶21**. After being notified of the penalty assessed against them, the disciplined party has the right to file a grievance regarding the punishment and appeal before a neutral arbitrator or to proceed to a court-martial.  **Deposition of John R. Brown at 74-75 (Exhibit 1), DSMF**.  The vast majority of contested disciplinary matters were referred to arbitration, as court-martial proceedings were exceedingly rare.  **Deposition of Paul Evanko at 11-12 (Exhibit 2)**. Oftentimes, the Pennsylvania State Police (hereafter, "PSP") would reach a settlement with the employee prior to a scheduled arbitration, with the result that the disciplined party would receive a penalty less than the one originally recommended by the disciplinary officer. **Deposition of Robert B**. **Titler 61-64, 160-232 (Exhibit 3)**. While it is true that in a court-martial case, the commissioner would have to sign-off on any pre-arbitration settlement, Defendant Titler was a de-facto decision-maker in this process.  He testified that he would be asked for his recommendation regarding the proposed settlement, and the Commissioner never disagreed with that recommendation.  **Titler[1] at 168-169.**

3.      Defendant Titler also exercised substantial control over the decisions made by the assistant disciplinary officer, Lt. Carl Harrison.  **Deposition of Hawthorne Conley at 92-93 (Exhibit 4)**.  Although Harrison issued discipline, "he always consulted with Titler prior to doing that for a good while." **Id.**

---

[1]In second and subsequent citations to deposition testimony, this document adopts the shorthand convention of referencing the deponent's last name, thus, *Deposition of Robert B. Titler* becomes *Titler at [page]*.

4.      Defendant Titler, as the DDO, wielded substantial power.  **Brown at 299-300.  (Exhibit 1)**.


II.    **Captain Titler's Abuse of Power**

A.     **Plaintiff has adduced evidence that Defendant Titler chronically abused  his disciplinary powers to create a wholly arbitrary disciplinary regime at PSP**

5.      Captain Titler had a well-earned reputation for abusing his power as the Department Disciplinary Officer ("DDO") and misusing the disciplinary procedures. **Deposition of Cynthia Transue at 63-118 (Exhibit 5), Conley at 21-34 (Exhibit 4), Deposition of Jeffrey Miller at 108 (Exhibit 6)**.

6.      Initially, it is improper for the DDO to consult with others when determining the appropriate punishment, because such a scenario subjects the DDO to the risk of inappropriate influence. **Conley at 30 (Exhibit 4)**.  Defendant Titler, however, would consider a troop commander's opinion of a member in his determination of appropriate discipline.  **Transue at 92 (Exhibit 5)**.  It was common knowledge that Defendant Titler would reach out to the troop commander for the troop commander's subjective opinion as to whether or not  the member was a "good guy." **Transue at 93**.   If the troop commander said he was a "good guy," then Defendant Titler would find mitigating circumstances which resulted in more lenient discipline.  **Id.**

1.     **According to his superiors, Titler misused his authority as Department Disciplinary Officer**.

7.      When Col. Hawthorne Conley supervised Titler, he often felt the need to correct and instruct Titler for various inappropriate actions.  **Conley at 21 (Exhibit 4).**

3

For example, Conley felt that many times Titler was too harsh in his punishment. **Conley at 23.** "You get a guy who is doing a great job and makes a mistake, he exercises poor judgment, that shouldn't be the deciding issue of his career. Discipline him, but issue a fair hand, an even hand." **Conley at 34**. Conley had disagreements with Titler's discipline being too harsh and occasionally he would modify it. **Conley at 135.**

8.      There was also an occasion where Conley believes Defendant Titler influenced the latter's assistant, Lt. Harrison, to improperly agree to a pre-arbitration settlement of a 45 day suspension in lieu of dismissal for a trooper who had participated in an illegal bookmaking operation for a period of ten years. **Disciplinary Action Report ("DAR") of Curtis D. Getz, (Exhibit 7)**; **Conley at 120-123 (Exhibit 4)**. In that case, Conley "would have [imposed] dismissal" because the case affected the "public trust, image of the agency by the public, and it's an ongoing practice for 10 years, and now he's getting other guys involved in it as well. I remember this case. I remember at the time it occurred." **Conley at 122.** "Titler had to assist [Lt. Harrison]  in making this decision. I'm sure of that, but because I just don't see Carl doing that." **Conley at 122.** "I'm just going by knowledge. . . I think it's inappropriate, but I'm sure that Carl didn't make this decision by himself" **Conley at 123-124.**

### 2.      Defendant Transue testified that Titler abused the disciplinary process, and after committing perjury was subjected to only lenient treatment by PSP.

9.      Lt. Col. Cynthia Transue testified that she was aware of instances in which PSP members committed infractions serious enough to warrant the imposition of

severe penalties but, instead, were treated leniently by the disciplinary officer or adjudicator.  **Transue at 63 (Exhibit 5)**.  In her deposition, she testified regarding several instances in which Defendant Titler abused the disciplinary process and one instance in which he committed perjury.

> a.   **Defendant Titler has a history of committing perjury in disciplinary proceedings and escaping punishment for same.**

10.     Lt. Col. Transue testified that Defendant Titler committed perjury and was not disciplined for his actions.  **Transue at 63-68.**  Specifically, Lt. Col. Transue, who was Defendant Titler's immediate supervisor at the time, had been told by Defendant Titler the results of a polygraph examination given to a PSP member. **Transue at 63-64.** Defendant. Titler's review of the polygraph results in determining the punishment was against regulation and counter to the procedure taught by Defendant Titler in a training class.  **Transue at 73**. The member was dismissed from the department. **Transue at 68.**   Later, Defendant. Titler testified at an unfair labor practice proceeding that he did not have the results of the polygraph.  **Transue at 67.**  When Lt. Col. Transue was told by the attorney for the Pennsylvania State Troopers Association that Defendant Titler had testified that he did not know the results of the polygraph, she obtained a copy of the hearing transcript and determined that Defendant Titler had lied under oath during the proceeding.  **Transue at 70, 72.**  Because Defendant Titler's actions violated the PSP regulations regarding truthfulness and would have resulted in perjury, Transue initiated an Internal Affairs investigation into Defendant Titler's conduct.  **Transue at 70-71.**

   **b.    Titler has a history of purposely withholding information in order to support his improper imposition of discipline, of improperly supervising the assistant DDO, and of manipulating the disciplinary process to prevent review of his actions**.

11.   Defendant Titler's perjury was not the first time his actions troubled Transue. Transue had previously approached Col. Miller regarding concerns with Captain Titler because she "had problems . . . with some disciplines that he had imposed on various members and how he later would have handled those issues when it came to the attention of the grievance committee."  **Transue at 74-75 (Exhibit 5)**.

12.   She also felt that Defendant Titler was not providing her with information she needed, was only giving her the information she needed to know and was inappropriately supervising his subordinate by insisting that Lt. Harrision impose discipline that Titler felt was appropriate, even if Lt. Harrison's discipline was proper. **Transue at 75, 97.**

13.   Transue testified that "There were four instances in which [Titler] had to come to me for approval of discipline, and I felt that when he did that, he only gave me the information that he wanted me to consider as opposed to any information that would exonerate the member."  **Transue at 75.**  Especially in court-martial cases, Titler would "present aggravating circumstances and leave out mitigating circumstances, or not offer them to me for my fair consideration."  **Transue at 76.**  In court-martial cases, discipline took the concurrence of the Deputy Commissioner and the Commissioner.  **Transue at 77.**

6

14.    Defendant Titler also manipulated the discipline process to impose inappropriately lenient discipline and hide it from his superiors.  Defendant Transue testified that "there were serious allegations against a trooper, and rather than bring them to my attention, [Defendant Titler] basically dealt with three separate incidents away for a period of suspension less than 30 days, so he did not have to bring it to my attention."  **Transue at 80-81.**  "There were three instances regarding a trooper, I believe, in Troop E, Erie.  And I don't recall how I learned what he had done, but there were at least two of the three allegations against the trooper that were very serious."  **Transue at 81-82.**

15.    The Erie incident involved a State Trooper who was in a state car at a bar.  **Transue at 86.**  The PSP received a call regarding an erratic driver and the car was found at the trooper's house the next morning.  **Transue at 86-87.**  The trooper had a blood-alcohol level of .06 the next morning.  **Transue at 87.**  Another incident involved this same trooper at a bar encouraging a known felon or felons to drink alcohol in violation of their probation.  **Transue at 87-88.**  The trooper gave a State Police uniform shirt to one of the individuals and allowed him to wear it in the bar; and provided to a drug dealer or drug dealers the listing of home telephone numbers of personnel at the station to which the trooper was assigned.  **Transue at 87-88**.  Lt. Col. Transue feels that the Trooper should have been dismissed, but Defendant Titler manipulated the system to prevent her from knowing about the incidents.  **Transue at 87-89.**  According to Transue, Titler:

imposed 30-day discipline, suspension without pay in both of those cases, which kept them from coming to my attention.  And ultimately when the trooper - when

7

the Pennsylvania State Troopers Association met at the grievance board, he
decided to lump those three separate incidents of misconduct, two of them being
quite serious, together and give the trooper a total of 30 days, which again
escaped my scrutiny or would have.

**Transue at 81-82.**  She reported Titler's actions regarding the Erie Trooper to PSP

Chief Counsel Barbara Christie.  **Transue at 98.**

16.     Defendant Transue was ultimately forced to change the reporting

procedure because she "was very uncomfortable with Captain Titler's imposition of

discipline."  **Transue at 77.**  As a result, she began requiring Titler to provide her with a

weekly matrix of all discipline imposed, including a case synopsis.  **Transue at 82-83.**

Shortly thereafter, a fourth deputy commissioner position was created and Transue's

oversight of Titler was taken from her purview.  **Transue at 83.**  Transue believes the

reorganization was the result of her questioning the way Internal Affairs investigations

were conducted and her questioning the way Department discipline was administered.

**Transue at 84.**  Prior to that, she had received the highest employee performance

reviews possible.  **Transue at 84.**

**c.      Titler improperly offered to mitigate discipline for a trooper based on Col. Transue's relationship to the trooper.**

17.      On another occasion, Defendant Titler approached Defendant Transue and offered to mitigate the discipline for a trooper and prevent him from being fired because Defendant Transue knew the trooper.  **Transue at 88-89.**

18.      In that case, Corporal Joseph Vasquez, had pulled his duty weapon and put it up against the head of a janitor.  **Transue at 89-90.**  In a separate case in a different troop, another trooper had pulled his weapon in horseplay and Titler was going to recommend dismissal for that trooper, a penalty with which Transue agreed.  **Transue at 91.**  Titler told Defendant Transue that, because she knew Trooper Vasquez,  he could distinguish Vasquez' case so that he would not be fired.  **Transue at 91.**  Transue told him to assign whatever penalty was appropriate, and Vasquez was also terminated.  **Transue at 91.**  Both troopers have since been rehired.  **Transue at 91.**  Interestingly, while Defendant Titler was willing to mitigate the case of Trooper Vasquez to preserve Vasquez' job, Defendant Miller, in his deposition, cited the Vasquez incident as an example of a case where dismissal would be the only appropriate discipline.  **Miller at 126. (Exhibit 6)**.

**d.      Titler improperly delayed the imposition of discipline to allow an officer to qualify for a 20-year pension**.

19.      Defendant Titler also misused his office by refusing to institute discipline against a member who should have been dismissed until that member had enough service hours to obtain a 20-year retirement.  **Transue at 105-106, 108 (Exhibit 5).**

9

20.     Sgt. Lapia had sexually assaulted a female corporal. **Transue at 106.** Lt. Marcy Robinson, the Equal Emloyment Opportunity Officer, reported to Deputy Commissioner Brown that Titler had gone to the Bureau of Human Resources and inquired as to the date when Lapia would have the hours in to qualify for a 20-year retirement. **Transue at 107-108; Robinson at ___.** According to Transue, "Had [Titler] imposed discipline at an earlier point in time, it is possible that the member would have been just shy enough hours of employment with the Commonwealth to obtain their 20-year retirement." **Transue at 105-106.** Titler's actions in allowing Sgt. Lapia to obtain a 20-year retirement were inappropriate. **Conley at 139-140. (Exhibit 4)**.

### e.     Titler misused his authority to inappropriately target a member for discipline.

21.     According to Defendant Transue, Defendant Titler participated in a scheme to improperly target Corporal Govan Martin for discipline because Corporal Martin was not in favor with Major Robert Einsel, who was under Transue's Deputate. **Transue at 109, 122-123 (Exhibit 5)**.

22.     In the Martin case, Transue received a call from Major Einsel regarding Cpl. Martin. **Transue at 110.** Captain Reilly, who was a report of Major Einsel, was adjudicating an incident involving Trooper William Gibson and Trooper Gibson had asked Cpl. Martin to go the pre-disciplinary conference to explain the member assistance program to Captain Reilly. **Transue at 111.** Though he was not required to do so, Capt. Reilly allowed Cpl. Martin into the conference and asked him questions, which Martin answered. **Transue at 110-113.** Major Einsel then requested from Transue that Cpl. Martin be investigated for interfering with an investigation. **Transue**

10

**at 113.**  Transue refused, but was later ordered by Defendant Miller to investigate the incident.  **Transue at 110, 113.**

23.     Although Capt. Reilly explicitly stated that Cpl. Martin did not influence his decision in any way, that statement did not appear in the investigative synopsis prepared by the Internal Affairs investigator.  **Transue at 113-114.**   At some point, Defendant Titler told Transue that the case against Martin was going to be "unfounded." **Transue at 114.**  Instead, Capt. Jeffrey Davis sustained the charges and Titler issued a five-day suspension.  **Transue at 114.**  When Transue asked Titler about it, he said he told her it was going to be "not sustained," but she clearly recalls him saying unfounded. **Transue at 114.**   An arbitrator later overturned the discipline for the same reasons that Transue had initially refused to investigate the matter, namely, it would be improper to allow a trooper into a pre-disciplinary conference, ask him questions, and then discipline him for answering them. **Transue at 115.**  As the allegations against Martin were meritless at best and in bad faith, Transue concluded that Martin had been selectively targeted for improper discipline.  **Transue at 115, 118.**

### 3.     Titler's deposition testimony reveals his abuse of the disciplinary process.

24.     Defendant Titler testified that he did not rely on a written list of aggravators and mitigators when deciding on discipline in a particular case.  **Titler at 174 (Exhibit 3)**.  He did offer that a serious aggravator was whether anybody outside the department was victimized;  **Titler at 174,** that he did not differentiate between the

victimization of a relative or a non-relative of the trooper; **Titler at 175,** and that

domestic violence and theft resulted in dismissal with no mitigation. **Titler at 175, 202.**

25.     A review of Titler's imposition of discipline, however, reveals that he had

trouble applying his own stated standards while willingly mitigating the penalty if the

member was a "good guy." Thus:

(1)     In the case of Roger Smith (1999-116), the trooper was accused of
domestic violence against his daughter and threatened to kill the victim.
**DAR of Roger Smith (Exhibit 15); Titler at 251-252.** Domestic violence
against a blood relation supposedly always warranted dismissal. **Titler at
175.** However, one of Titler's classmates from the police academy was
involved in this case. **Titler at 252.** Titler imposed a five day suspension.
**Titler at 251.**

(2)     In the case of Matthew Tuzynski (67 of 2000), the trooper was accused of
sexual molestation of children. **DAR of Matthew Tuzynski (Exhibit 16)**;
**Titler at 255.** The recommended penalty was dismissal, but Titler agreed
to a pre-arbitration settlement which allowed the trooper to utilize leave in
order to qualify for a 20 year retirement**. Titler at 255.** Titler now admits
that this was wrong. **Titler at 255.**

(3)     In the case of Marc Nickens (2000-135), the trooper threatened to take his
weapon into the Lieutenant's office and "blow his head off." **DAR of Marc
Nickens (Exhibit 13); Titler at 223.** Pursuant to a pre-arbitration
settlement, the trooper received a 60 day suspension plus a transfer.
**Titler at 223.**

(4)     In the case of Trooper Unrue, the trooper had patronized prostitutes on 21
different occasions. **DAR of Derrick Unrue (Exhibit 17); Titler at 256.**
Titler consented to a pre-arbitration settlement reducing the penalty from
dismissal to a 45 day suspension. **Titler at 256, 257.** Titler agreed that
the settlement was not proper. **Titler at 257.**

(5)     In the case of Trooper Fleming (2002-132), the trooper had engaged in
harassment and stalking. **DAR of Eugene A. Fleming, III (Exhibit 11);
Titler at 198.** Fleming assaulted another motorist twice with a closed fist,
but the District Attorney declined to prosecute. **Titler at 204.** Aggravating
circumstances existed in that the trooper had prior interpersonal
problems. **Titler at 201.** Titler spoke with Fleming's commanding officer
and was told that Fleming was "trying to turn around." **Titler at 198.**

Although the assault on the motorist resulted in somebody outside the department being victimized, Titler asked Fleming's CO to refer him to member's assistance and instituted a 15 day suspension. **Titler at 198, 200, 204.** The suspension was reduced to 8 days pursuant to a pre-arbitration settlement. **Titler at 204.**

(6)     In the case of Trooper Getz, the trooper placed a bet with a bookmaker and took bets with other officers. **DAR of Curtis D. Getz (Exhibit 7)**. Lt. Harrison adjudicated dismissal. The case was settled prior to arbitration as a 45-day suspension. As detailed above, Col. Conley believes that Trooper Getz should have been dismissed and that Titler influenced Harrison to agree to the reduced penalty. **Conley at 121-124 (Exhibit 4); Titler at 205-208 (Exhibit 5).**

(7)     In the case of Trooper Darren Lawrence (2000-83), the trooper entered into a sexual liaison with a confidential informant and took her to a hotel where undercover drug law enforcement officers were meeting, potentially exposing the undercover officers' identities. **DAR of Darren Lawrence (Exhibit 12); Titler at 214-216.** Although Trooper Lawrence's actions could constitute official oppression and interference with an investigation, Titler adjudicated a 5 day suspension. **Titler at 215**.

(8)     In the case of Paul Nieves, the trooper, while off duty, forcibly stopped a vehicle on Interstate 80 in a road rage incident and pulled a gun on the motorist. **DAR of Paul Nieves (Exhibit 14)**. The victim was not a member of the department. The Trooper later refused to dismiss the charges against the victim. Titler issued a 10-day and a 15-day suspension without pay. **Titler at 225-232.**

(9)     In the case of Trooper Derosiers (2000-136), the trooper knew the whereabouts of an individual subject to an arrest warrant and failed to tell the trooper seeking to execute the warrant. **DAR of  Robert L. Desrosiers (Exhibit 10); Titler at 185.** Titler imposed a five day suspension after speaking with the Derosier's commanding officer. **Titler at 184-185, 196.**

(10)     In the case of Allan Brown, 2000-28, the trooper lied about a towed vehicle and stole beer. **DAR of Allan Brown (Exhibit 9)**. Even though Defendant Titler testified that "theft" should result in an automatic dismissal, Brown received a 30-day suspension without pay and was transferred. **Titler at 173-174.**

### III. __The improper discipline of Trooper Shugarts__

26.    Plaintiff William T. Shugarts joined the Pennsylvania State Police on September 25, 1995 when he entered the Pennsylvania State Police Academy. **Affidavit of William T. Shugarts ("Aff. WTS"), ¶1 (Exhibit 8)**.

27.    Upon graduating from the Academy, Trooper Shugarts was assigned to Troop F, Coudersport Station and performed various functions including desk duty, crime investigation, accident investigation and patrol duty.  **Aff. WTS ¶2.**

28.    After four years at Troop F, Trooper Shugarts requested a transfer to Troop C (Punxstawney), DuBois Station so that he could be closer to home.  **Aff. WTS ¶3.**  His request for transfer was approved and he reported for duty on January 24, 2000. **Aff. WTS ¶3.**

29.    Trooper Shugarts was one of the top performing officers in Troop C. **Deposition of James Tripp at 71-72, 114.  (Exhibit 18)**. Captain Tripp testified that when he "looked at the results on a monthly basis that Trooper Shugarts was one of the highest issuance of citations at the station. . . .It was good.  I mean, he's out there to do a job, and that's to slow the public down, and that's what he did."  **Tripp at 71-72.**  Prior to the incidents which led to Shugart's termination, Shugarts had always received high marks for his performance. **Aff. WTS ¶29.**

A.   **The Barilar incident**

   1.   **Trooper Shugarts issues a citation to a Lieutenant's wife.**

30.   On February 5, 2000 while running radar on SR 322 near Union Township, Trooper Shugarts pulled over a vehicle driven by an individual who identified herself as Jennifer Barilar and issued her a traffic citation for speeding.  **Aff. WTS ¶4**. Jennifer Barilar is the wife of Lt. Steve Barilar and the sister of Sgt. Neal and Trooper Neal.  **Deposition of Stephen J. Barilar at 95 (Exhibit 19); Tripp at 54 (Exhibit 18).** Lt. Barilar and Cpl. Randy Yohe are "good acquaintances."  **Patrick Depo Ex. 1 at 10 (Exhibit 20).** At the time, Trooper Shugarts was unaware that Ms. Barilar was the wife of Lt. Barilar and the sister of Sgt. Neal.  **Aff. WTS ¶5.**

31.   Mrs. Barilar asked Trooper Shugarts if the fact that she was married to a PSP trooper would affect his decision to issue her a citation.  **Aff. WTS ¶7**  Trooper Shugarts told her that it would not.  **Aff. WTS ¶7**.

32.   Within fifteen minutes of issuing the citation, Trooper Shugarts received a radio transmission informing him that he had received a telephone message regarding the citation he had just written to Mrs. Barilar.   **Aff. WTS ¶8.**  When he arrived at the station, he was directed by his Corporal, Randy Yohe, to call a Lieutenant Stephen Barilar.  **Id.**  After directing Trooper Shugarts to call Barilar, Yohe took him aside and told him that "We take care of our own." **Id.** Trooper Shugarts interpreted Corporal Yohe's statement to mean that he was not to issue citations to the spouses of other PSP members.  **Id.**

33.     Trooper Shugarts called Lt. Barilar, as Corporal Yohe had directed.  **Aff. WTS ¶9.**  Lt. Barilar informed Trooper Shugarts that he was Jennifer Barilar's husband and asked him to get rid of the citation and not forward it to the magistrate's office.  **Aff. WTS ¶9.**  Trooper Shugarts informed Lt. Barilar that he couldn't do anything for him.  **Aff. WTS ¶9.**  Lt. Barilar then replied that he would talk to Trooper Shugarts' sergeant (Glen Steingrabe) later.  **Aff. WTS ¶9.**

34.     Sometime later, Lt. Barilar again called the station and Trooper Shugarts answered the phone.  **Aff. WTS ¶10**.  After realizing that the person he was calling to speak with was not on duty, Lt. Barilar then asked to speak with Cpl. Yohe, at which point Trooper Shugarts handed the phone to Corporal Yohe.  **Aff. WTS ¶10.**

35.     Two of Trooper Shugarts superiors approached him regarding the ticket he issued to Lt. Barilar's wife, Cpl. Yohe and Sgt. Steingrabe.  **Aff. WTS ¶8, 11.**

36.     As noted earlier, Cpl. Yohe told Trooper Shugarts that he wouldn't have arrested Jennifer Barilar and that "[w]e, you know, take care of our own."  **Carnahan Deposition Exhibit 2, General Investigative Report, at 7 (Exhibit 21); Aff. WTS ¶8 (Exhibit 8).**

37.     Sgt. Glen Steingrabe approached Trooper Shugarts on at least two occasions to inform him that Lt. Barilar wanted the citation to disappear.  **Aff. WTS ¶11.**  Sgt. Steingrabe told Lt. Patrick that he approached Trooper Shugarts on his first shift back to work:

> I spoke with him and gave him an example about a time that my wife had been stopped for speeding.  Her father was going through cancer treatments and he had to be Life-flighted to Morgantown after he had a reaction to the chemo.  She was going down SR 119 and got stopped on

16

the Indiana four-lane.  The trooper, upon finding out that she was my wife, told her, slow down, you're not gonna do your family any good if you get in an accident.  I appreciated the trooper for showing her some courtesy.  That was the example I gave Trooper Shugarts.  I told him that this was a traffic violation, it wasn't a DUI or anything and there's no reason we can't take care of our own people.

He told me that in the past he had stopped someone that said they were so and so's brother or family member.  He didn't give them a citation and later found out there was nothing there.  So, basically he said, he issues a citation.  He did not say to me, that he would take care of it later if he found out they were telling the truth.

**Patrick Exhibit 1 at 11-12 (Exhibit 20).**

38.     In addition to being Trooper Shugarts' superior, Cpl. Randy Yohe was a personal friend of Jennifer Barilar's brother, Sgt. Scott Neal.  **Barilar at 19 (Exhibit 19).**

39.     Lt. Barilar called regarding the scheduling of the hearing on his wife's citation so that he would be certain to be able to attend.  **Barilar at 31.**  He spoke with Sgt. Steingrabe and asked him what the District Justice was like.  **Barilar at 34.**  Sgt. Steingrabe informed Lt. Barilar that the District Justice was unapproachable, so he knew that there was no reason to talk with the District Justice in an attempt to get the ticket reduced.  **Barilar at 34-35.**

### 2.     The Hearing Before District Justice Patrick Ford

40.     A hearing on the citation issued to Jennifer Barilar was held before District Justice Patrick Ford.  **Aff. WTS ¶13 (Exhibit 8), Barilar at 39-44 (Exhibit 19), Patrick Investigative Report at 1 (Exhibit 20).**

41.     Prior to the hearing, Lieutenant Barilar approached Trooper Shugarts and introduced himself as "Lieutenant Barilar."  **Aff. WTS ¶13.**

42.     Trooper Shugarts felt that Lt. Barilar and Sgt. Steingrabe were pressuring him to take steps to undo the citation that he had issued to Jennifer Barilar. **Aff. WTS ¶12.**

43.     At the hearing, Shugarts intentionally omitted elements of the prosecution's case, including judicial notice of the radar gun and the identity of the defendant. **Aff. WTS ¶14**.  Nevertheless, Shugarts believed that he had presented sufficient evidence for the District Justice to find Lt. Barilar's wife guilty.  **Aff. WTS ¶14.**

44.     District Justice Ford became irate.  He told Trooper Shugarts and Lt. Barilar to "get you act together" and left the bench.  **Aff. WTS ¶15.  Barilar at 44 (Exhibit 19).**

45.     During District Justice Ford's absence from the courtroom, Lt. Barilar approached Trooper Shugarts and asked him to reduce the charge against his wife. **Aff. WTS ¶16; Barilar at 44.**  Trooper Shugarts refused.  **Barilar at 44.**  When District Justice Ford returned to the hearing room, he dismissed the citation and informed Trooper Shugarts and Lt. Barilar that he was going to call Captain Tripp.  **Aff. WTS¶16**.

46.     After returning to the station, Trooper Shugarts learned that District Justice Ford had in fact contacted Captain Tripp and alleged that Trooper Shugarts and Lt. Barilar had conspired to throw the case.  **Aff. WTS ¶17.** Trooper Shugarts was subsequently notified that the PSP Internal Affairs Division had opened an investigation into the incident to determine whether any PSP member had engaged in wrongdoing. **Aff. WTS ¶17**.

3.     **The criminal investigation into the Barilar incident**.

47.     The criminal investigation into the Barilar incident was conducted by Trooper Donald Carnahan. **Deposition of Donald Carnahan, at 34 *et seq.* (Exhibit 22)**. Lt. Barilar and Sgt. Steingrabe asserted their fifth amendment right and refused to be interviewed by Lieutenant Donald T. Carnahan of the PSP's Internal Affairs Division. **Id.**

48.     Cpl. Yohe gave a statement to Lieutenant Carnahan in which he stated that "Lieutenant Barilar informed him that Trooper Shugarts cited his wife. Lieutenant Barilar asked him what Shugarts was like and asked him to leave a message for Trooper Shugarts to call him (Barilar)." **Carnahan General Investigative Report at 7 (Exhibit 21).**

49.     There was no mention in Cpl. Yohe's statement that Trooper Shugarts had asked Mrs. Barilar to have her husband call him or that in his "personal opinion" members should take care of their own. **Id., Depo. Carnahan at 59-60 (Exhibit 22); Depo. Deposition of Michael Patrick at 79-80 (Exhibit 23).**

50.     After being guaranteed immunity from prosecution, Trooper Shugarts agreed to give a statement regarding the incident to Lieutenant Carnahan and District Attorney Cherry. **Aff. WTS ¶18. Carnahan at 34. (Exhibit 22)**. In his deposition, Lieutenant Carnahan testified that "Trooper Shugarts gave some damning information regarding Lieutenant Barilar when he talked. I believe D.A. Cherry even handwrote, if my recollection is right, just an immunity waiver for Trooper Shugarts so that he could

talk to me, and he was guaranteed immunity from any criminal prosecution by D. A. Cherry." **Carnahan at 34.**

51.     Upon completion of his investigation, Lieutenant Carnahan forwarded his report to Clearfield County District Attorney Paul Cherry who determined that probable cause existed to charge Lt. Barilar with Intimidation of Witnesses and Obstructing Administration of Law.  **Carnahan at 34; Carnahan Affidavit of Probable Cause, Stephen Barilar, Defendant (Exhibit 24)**; **Letter, Paul E. Cherry to Lt. Donald T. Carnahan, December 5, 2000 (Exhibit 31)**.  Lieutenant Carnahan swore out a probable cause affidavit against Lt. Barilar and Lt. Barilar was arrested. Id.

52.     The arrest of Lt. Barilar resulted in a newspaper story and brought negative publicity to the Pennsylvania State Police.  **Evanko at 28 (Exhibit 2); Patrick Depo. Exhibit 2, page 4 (Exhibit 25).**

53.     Following the arrest of Lt. Barilar, District Justice Ford and Lieutenant Carnahan believed that "the fix was in" to have the charges against Lt. Barilar dismissed.  **Carnahan at 40-43, Patrick IAD Report at 7-10 (Exhibit 20).**  Lieutenant Carnahan was told by the district attorney's office to only subpoena Trooper Shugarts for Lt. Barilar's preliminary hearing and District Judge Ford was upset because he was not being called upon to provide testimony and because District Justice Ireland was being removed from the case.  **Carnahan at 40-46.**  Additionally, District Justice Ireland was removed from presiding over the hearing by a court order and "[w]ithin minutes of hanging up with Nadio, Ireland stated that he received a fax with the unsigned order removing him from the case, which led Ireland to believe that the arrangements to

20

remove him were coordinated earlier." **Carnahan at 44-45; Carnahan Memorandum to John R. Brown, 2/12/01 (Exhibit 26).** District Justice Ford believed that District Attorney Cherry was not aggressively prosecuting Lt. Barilar. **Carnahan at 40-41.**

54.     Lieutenant Carnahan testified that he "always thought that Barilar had married a local girl there and that perhaps the fix was in. I didn't know . . . You know, it makes you wonder." **Carnahan at 43**.

55.     The charges against Lt. Barilar were dismissed at the preliminary hearing held before District Justice James Hawkins. **Carnahan at 68-69.**


### 4.     The administrative investigation into the Barilar incident.

56.     Following the dismissal of charges against Lt. Barilar, an administrative investigation into the incident was performed by Lieutenant Michael Patrick, an investigator with PSP's Internal Affairs Division. **(Exhibit 20)**.

57.     Lieutenant Patrick testified that while there was no evidence which indicated collusion between Lt. Barilar and Trooper Shugarts, there was evidence of intimidation on the part of Lt. Barilar against Trooper Shugarts, i.e. Lt. Barilar had telephoned Trooper Shugarts regarding the issuance of a speeding citation against Lt. Barilar's wife and had attended the hearing on the citation. **Patrick at 64, 67-68 (Exhibit 23).**

58.     For the first time, allegations surfaced that Trooper Shugarts had told Mrs. Barilar to have her husband call him when he had issued her the speeding citation

when Lt. Barilar, his wife and Sgt. Steingrabe each told Lieutenant Patrick that Trooper

Shugarts had told Mrs. Barilar to have her husband call him. **Patrick at 69.**

59.     Captain Brown directed Lt. Patrick to re-interview Sgt. Steingrabe and Cpl.

Yohe and add them as additional subjects. **Patrick at 76.**

60.     Before the investigative report was completed, however, a series of e-

mails was sent between Captain John Rice; who was Lt. Barilar's troop commander,

Major Robert Werts; Lt. Barilar's area commander, Captain Robert Titler; the

Department Disciplinary Officer, Col. Hawthorne Conley; Defendant Titler's Supervisor,

Thomas K. Courey; Captain John R. Brown; the head of Internal Affairs, Barbara L.

Christie; Christopher D. Carusone; Deanna M. Webster; Wilfred J. Pudliner, Jr. and Lt.

Patrick, who was conducting the administrative investigation into the Barilar Incident.

**Email thread, March 1, 2001 through March 6, 2001 (Exhibit 27).**  Within these e-

mails, a request was made to have Lt. Barilar returned to duty. **Id., Patrick at 88,**

**Conley at 53-62.**   Although he had not yet received a copy of the investigative report,

in one of these e-mails, Captain Brown stated that "Tpr. Shugarts was dishonest during

the investigation and prosecution." **Patrick at 93, Patrick exhibit 6.** Captain Titler

stated that he would need to see the report before he could determine whether the

restrictions placed on Lt. Barilar should be lifted because the accusations against him

could warrant dismissal. **Patrick at 88-93; Email thread (Exhibit 27)**.   Lieutenant

Patrick, who was then conducting the investigation into Barilar, was copied on these e-

mails.  **Id., Patrick at 93**.

22

61.     It was clear in Col. Conley's mind that there was a pursuit of Trooper Shugarts regarding the Barilar incident.  **Conley at 62 (Exhibit 4).**  Conley, who was at this time assigned to the Bureau of Professional Responsibility, thought that Lt. Barilar was the one who should have been under investigation.  **Conley at 48-49.**  He thought that "[Shugarts] may have exercised poor judgment in the way he handled the case, but it didn't surprise me.  That wasn't unusual.  I thought that it was interesting that [Shugarts] was being pursued" and not, by comparison Barilar.  **Conley at 48.**  Conley testified: "[F]rom what I saw, [Lt. Barilar's] actions got Trooper Shugarts in trouble, and forgetting about all this other stuff, the only person I saw getting disciplined at the time was Trooper Shugarts, and I had a problem with that."  **Conley at 63-64.**  "Should [Shugarts] be disciplined?  Possibly.  Should Barilar have been disciplined?  Probably." **Conley at 69.**

62.     Subsequent to the receipt of these e-mails, Lieutenant Patrick completed his investigation.  **Patrick at 94-96; General Investigative Report (Exhibit 20).**

### 5.     The discipline resulting from the Barilar incident.

63.     The adjudicator for Lt. Barilar was his commanding officer, Captain John Rice, with assistance from Major Werts.  **Barilar at 87; Titler at 108-110.**

64.     It is clear that Lt. Barilar's conduct was in violation of department rules and regulations and he should have received formal discipline.  **Conley at 69; Evanko at 22-23; Tripp at 27, 35-36, 42-43**.  Captain Tripp testified that: "My thoughts are that [Barilar] interfered in the arrest of a member.  I believe he intimidated Trooper Shugarts

to the point that Trooper Shugarts did what he did, and I believe that his actions were as bad as or worse than Trooper Shugarts." **Tripp at 51.**

65.     Captain Rice, however, determined that most of the allegations were unfounded and only "sustained and counseled" - the procedure for *de minimis* violations - Lt. Barilar on the order of Major Werts who thought that Lt. Barilar may have given an improper perception that he wanted something done by telephoning Trooper Shugarts. **Barilar at 87-90.**

66.     Captain Tripp served as the adjudicator for Trooper Shugarts, Sgt. Steingrabe and Cpl. Yohe. **Shugarts ¶19.  Tripp at 77.**  Sgt. Steingrabe's and Cpl. Yohe's conduct violated PSP field regulations. **Patrick at 79-83, 84-86.**  However, Captain Tripp testified that he "probably" said something to Steingrabe and Yohe, but they were not formally counseled and the  allegations against them were deemed unfounded. **Tripp at 77, 84-85.**

67.     Captain Tripp issued a Disciplinary Action Report for Trooper Shugarts which was subsequently forwarded to the Department Discipline Officer, Captain Titler. **Aff. WTS ¶19.  Titler at 104.**

68.     Although the discipline was purportedly issued by Lt. Harrison, there is no doubt that Captain Titler played a substantial role. **Titler at 89-128**.  Captain Titler believed he was involved in the discipline and Captain Tripp recalled speaking with Captain Titler regarding the issuance of a 2-day suspension without pay for Trooper Shugarts. **Titler at 104.   Tripp at 27.**

24

69.     Trooper Shugarts in fact received a  two day suspension without pay and was the only person who received discipline regarding the Barilar incident. **Aff. WTS ¶20.  Titler at 159.  Tripp at 37, 77.  Barilar at 87-90.**

70.     Although Brown had stated that Trooper Shugarts had lied during the investigation and that Lt. Barilar had been completely cleared, no investigation was undertaken regarding Trooper Shugarts alleged deception and no discipline resulted from this alleged conduct.  **Brown at 210-211.**  Trooper Shugarts' statements and testimony regarding the Barilar incident were consistent throughout the investigation. ***See generally,*** Aff. WTS; General Investigative Report (Exhibit 21); Interview of William T. Shugarts (Exhibit 28); General Investigative Report (Exhibit 20).

### 6.     The aftermath of the Barilar incident

71.     Following the Barilar incident, Trooper Shugarts was subjected to various acts of retaliation.  **Aff. WTS ¶21.**  He was denied overtime for the radar detail, received a lower job evaluation and was mistreated by his supervisors, Sgt. Steingrabe and Cpl. Yohe. **Id.** Additionally, his supervisors began to treat him in an unfriendly and standoffish manner.  **Id.**

72.     After a Protection From Abuse order had been entered against him following a July 2000 domestic dispute with his wife, he was subject to an extremely lengthy IAD investigation, which was held open for twenty months.  **Aff. WTS ¶22.** During this time, the IAD investigator, Judith Burrows, repeatedly solicited information from his wife for the purpose of manufacturing a finding of misconduct against him.  **Id.**

Despite the length of the investigation and Ms. Burrows' relentless efforts to build a case against Trooper Shugarts, IAD eventually determined that the charge against Shugarts was unfounded.  **Id.**

73.    There was certainly resentment on the part of other members of the PSP against Trooper Shugarts for his ticketing of Lt. Barilar's wife "[b]ecause there are some people who believe that he should have given her a break."  **Conley at 84-85.**

74.    "[T]here was conversation about it through the entire troop[.]" **Tripp at 50.** A number of people were upset with Trooper Shugarts over the Barilar incident.  **Tripp at 86**.  It was even discussed outside of Troop C**.  Tripp at 89.**  Captain Tripp testified: "I remember that I would attend a meeting here or a meeting there and somebody would bring it up.  I mean, for a Lieutenant to get arrested, you know, it becomes knowledge within the organization." **Tripp at 89.**  The fact that Lt. Barilar did not receive punishment for his role in the Barilar incident came up in the arbitration case of Lt. Diane Stackhouse "and was one of the things that was considered in making the determination that we were [not] allowing sustained and counseled anymore.".  **Titler at 159-160.**


**B.**     **The UniMart incidents.**

75.    On July 12, 2001, Trooper Shugarts was charged with summary offenses of disorderly conduct, harassment and public drunkenness for an incident occurring on or about April 1, 2001 at a DuBois UniMart wherein a UniMart employee alleged that Trooper Shugarts had made comments about her breasts and had asked her to show

them to him.  **Criminal Complaint OTN 414580-5 (Defendants' Exhibit U, at 29); Aff. WTS ¶23.**

76.     Trooper Shugarts was also charged with misdemeanor offenses of official oppression and disorderly conduct, and a summary offense of harassment related to a separate incident at the same UniMart on or about May 5, 2001 wherein a woman alleged that Trooper Shugarts had propositioned her for sex and, when she refused, showed his badge, ordered her from the street and eventually made a report to the DuBois Police that she was in possession of illegal drugs.  **Criminal Complaint OTN H414581-6 (Defendants' Exhibit U, at 29); Aff. WTS ¶23.**

77.     Trooper Shugarts was suspended without pay on July 13, 2001 and an administrative investigation which was being conducted into the second incident was held in abeyance pending the disposition of the criminal charges against him.  **Aff. WTS ¶24.**

79.     There were only two reasons that Trooper Shugarts pled guilty to the reduced charges, both of which were directly tied to the fact that he had two young children to support.  **Aff. WTS ¶26.**  First, his attorney, Cortez Bell III, had informed him that if he contested the charges he would not be able to return to work for at least the next ten months, as that was the current waiting time for criminal cases to come to trial in the Clearfield County Court of Common Pleas.  **Id.**  Given his current suspension without pay, he was facing the prospect of being deprived of his earnings for almost a year.  **Id.**  Second, he was told by the attorney for the Pennsylvania State Troopers Association that a plea of guilty to Disorderly Conduct-Misdemeanor 3 and Public

27

Drunkenness-Summary would not constitute "just cause" for termination of his employment with PSP, and that he could therefore expect to be reinstated with the PSP. **Id.**  It was for these reasons only that he accepted the plea agreement offered by the District Attorney.  **Id.**  Had he not been advised in this manner by his attorneys, he would not have accepted the plea agreement. **Id.**

80.     Col. Conley verified this practice in his deposition testimony regarding the case of Robert Williams (IAD-10115).  **DAR of Robert Williams (Exhibit 29); Conley at 101**.   In that case, Trooper Williams had pointed a gun at PCO Sykes (another PSP employee) and her children**.  Evanko at 48.**  Williams pled guilty to harassment and *nolle prossed* the remaining criminal charges which had been filed against him. **Evanko at 51.**  The charges against Trooper Williams were serious enough to result in Williams being terminated and Williams should have been fired.  **Evanko at 50-51, Conley at 101**.  However, Trooper Williams was adjudicated a 3-day suspension and subsequently received a pre-arbitration settlement of a  one day suspension.  **Evanko at 50.**

81.     Col. Conley illustrated PSP's practice of limiting discipline regarding criminal charges to those charges where there has been a finding of guilt when he testified that  "you have to disregard the more serious crimes because they were *nolle prossed* and only go with the harassment case charge there."  **Conley at 99**.  "I look at here, and I look at this, and I know Robert Williams, and he probably should have been fired.  That's just my opinion again.  I was his commander at one time, but the cases were *nolle prossed* or dismissed, and the only thing you had left was the harassment. .

." **Conley at 101.** "[Williams] only plead the one thing, and that was harassment, and I think that's what Harrison has to deal with. Whether we want to deal with something else or not I think he is forced. I mean, I heard everything you said, but I'm thinking about reality now again." **Conley at 110.**

82.    Following the disposition of the criminal case, the administrative case was continued and an  investigative report was ultimately forwarded to Captain Tripp for adjudication. **Aff. WTS ¶27.**  Tripp sustained the administrative charges and issued a DAR. **Aff. WTS ¶27.**

83.    When Defendant Titler received the DAR, he was well aware of the prior incident regarding Shugarts and Barilar. **Titler at 246.**  "Someone may have said something like isn't that the guy that was involved in Barilar[.]" **Titler at 247.** Although Shugarts was one of the highest performing officers in his troop, Defendant Titler found that *no* mitigating circumstances existed. **Titler at 236-237**

84.    Additionally, contrary to his normal practice, Defendant Titler did not contact Captain Tripp to see if there were any mitigating circumstances or to see what kind of a trooper Shugarts was. **Tripp at 114-115.**

85.    Also contrary to the established practice of the department, as detailed in the testimony of Col. Conley, Defendant Titler's Supervisor at the time, Defendant Titler did not limit the discipline to those charges for which a finding of guilt had been made**. Titler at 236-238; Conley at 99-110.**

86.    Thus, Titler determined that Shugarts' conduct was in violation of PSP Field Regulations, Conformance to Laws, Unbecoming Conduct, Use of Alcohol-Off

Duty, Internal Investigations, Competency and Discrimination or Harassment. **Titler at 236-238.**

87.     Captain Tripp, whom Defendant Titler stated possesses "exceedingly high integrity," disagrees with the Titler's determination. **Titler at 132; Tripp at 108.** Captain Tripp testified that he would have charged Trooper Shugarts only with conformance to laws, unbecoming conduct and use of alcohol and would not have charged Shugarts with internal investigations, competency or discrimination or harassment. **Tripp at 108.**

88.     Trooper Shugarts elected to grieve the discipline. **Aff. WTS ¶28.** While it was common for Titler to agree to a pre-arbitration settlement in cases where the alleged conduct was far more serious than the allegations against Trooper Shugarts, no such discussions took place and the arbitrator upheld the penalty of dismissal. **Aff. WTS ¶28.** A factor in the arbitrator upholding the penalty was Trooper Shugarts prior discipline, including the Barilar Incident. **Aff. WTS ¶28; Arbitration Opinion and Award, August 19, 2002 (Defendants' Exhibit II, at 33-34).**

III.    **Changes To The State Police Discipline Policy**

89.     On September 8, 2003, the Office of The Inspector General issued an Investigative Report On Sexual Harassment And Sexual Misconduct At The Pennsylvania State Police, wherein the OIG found that the State Police do not document all misconduct and that discipline is often minimal, disparate and diminished during the grievance process. **Investigative Report on Sexual Harassment and**

**Sexual Misconduct at the Pennsylvania State Police, Office of Inspector General, Donald L. Patterson, at 35-38 (Exhibit 30).**

90.     As a result of the report, the PSP changed their discipline procedures to eliminate the "sustain and counsel" procedure.  The Barilar Incident was also "one of the things that was considered in making the determination that we were [not] allowing sustained and counseled anymore." **Titler at 159-160.**

91.     Several categories have also been created which warrant automatic dismissal including theft, gun play, "pointing guns at other members," "integrity, lying during official proceedings when you have an obligation to be truthful."  "sexual misconduct."  "serious acts of sexual misconduct."  "inappropriate touching."  "domestic violence, where the person is in fear of their life."  "driving state car while underneath the influence of alcohol."  "if you're arrested for DUI and it's your second offense off duty, any time during your career, you're dismissed.   DUI with hit-and-run;. "if you're involved in a -- incarcerated where you would lose your CLEAN privileges, like for instance, access to the NCIC CLEAN."  (Commonwealth Law Enforcement Assistance Network.)  "if you lose your operating privileges for more than 180 days . . . drug use. . . . you get a positive drug test, you're dismissed."  and Official oppression. **Brown at 98-103.**

Respectfully submitted,


/s/ Richard S. Matesic
Richard S. Matesic
PA ID No. 72211

/s/ Edward A. Olds
Edward A. Olds
PA ID No. 23601

1007 Mount Royal Boulevard
Pittsburgh, PA 15223
412.492.8975

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2007, I electronically filed the foregoing Plaintiff's

counterstatement of material facts not in dispute with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to:

Scott A. Bradley, Esquire
Gerald J. Pappert, Esquire
Susan J. Forney, Esquire
Office of Attorney General
564 Forbes Avenue
Pittsburgh, PA 15219


/s/ Richard S. Matesic