IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM T. SHUGARTS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:04-10 |
| | ) | |
| v. | ) | |
| | ) | JUDGE KIM R. GIBSON |
| CAPTAIN JAMES TRIPP, | ) | |
| CAPTAIN ROBERT B. TITLER, | ) | |
| CYNTHIA L. TRANSUE, and | ) | |
| COL. JEFFREY B. MILLER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

**Gibson, J.,**

This matter is before the Court because Plaintiff, William T. Shugarts, does not think that the actual reason for his termination was his conduct that amounted to six departmental violations and resulted in guilty pleas to three criminal charges. Instead, Plaintiff believes the Pennsylvania State Police (PSP) in reality fired him because of his conduct in issuing a speeding ticket to the wife of a PSP member and the subsequent investigation. Plaintiff has failed to establish a genuine issue of material fact as to whether his termination violated any of his Constitutional rights. Consequently, the Court grants summary judgment in favor of Defendants.

### Facts

William T. Shugarts, enlisted with the PSP on September 25, 1995. (Def.'s Statement of Material Facts Not In Dispute (DSMF) ¶ 23.) He started out with Troop F in Moutoursville, then

1

later transferred to Troop C in Punxsutawney on January 24, 2000. (DSMF ¶ 24.) For some reason, Plaintiff's career took a steep downturn in Punxsutawney. Two incidents of misconduct took place while Plaintiff was with Troop C: the Barilar and Unimart incidents.[1] Plaintiff ostensibly was dismissed for violating PSP rules in the Unimart incident, namely, Conformance to Laws, Unbecoming Conduct, Use of Alcohol-Off-Duty, Internal Investigations, Competency, and Discrimination or Harassment. (*See* Arbitration Award and Opinion, Def.'s Ex. M.)

Plaintiff believes the decision to terminate him is unfounded. He has brought an Equal Protection claim because he believes he was treated differently from other PSP members who misbehaved but were not terminated. He has also brought a First Amendment retaliation claim because he believes that protected speech he engaged in during the Barilar incident was a substantial factor in his termination for the Unimart incident.

Because the Barilar and Unimart incidents are crucial to understanding this former state trooper's professional decline, the Court will describe them one by one.

## The Barilar Incident

The following facts are undisputed. On Saturday, February 5, 2000, Plaintiff pulled over a car for speeding. (Pl.'s Statement of Material Facts Not In Dispute (PSMF) ¶ 30.) The driver of the car was Jennifer Barilar, the wife of PSP member Lt. Steve Barilar. (*Id.*) Plaintiff did not know Lt. Barilar. Jennifer Barilar asked if it would make a difference in Plaintiff's decision to issue a citation if her husband were a state trooper (PSMF ¶ 31). Plaintiff said no and wrote up a ticket. (*Id.*)

It is disputed whether Plaintiff told Jennifer Barilar to have her husband call him or Lt.

---

[1] "Unimart incident" refers collectively to two incidents, approximately one month apart, that took place at the same Unimart.

2

Barilar called Plaintiff on his own initiative after learning of the ticket. (PSMF ¶ 32; DSMF ¶ 41.) Whatever the case, Plaintiff and Lt. Barilar did talk on the phone. Plaintiff's version of the conversation is that Lt. Barilar asked him to get rid of his wife's ticket. (PSMF ¶ 33.) Plaintiff also says that two of his superiors, Corporel Yohe and Sgt. Steingrabe, pressured him regarding the ticket. (PSMF ¶¶ 35-38.) Defendants portray Lt. Barilar as lacking any ulterior motive whatsoever in contacting the state trooper who pulled over his wife. (*See* DSMF ¶¶ 44-45.)

Jennifer Barilar's summary trial before District Justice Patrick Ford was quite strange. Plaintiff intentionally presented a sloppy case, even neglecting to ask the court to take judicial notice of the radar gun and the identity of the driver. (PSMF ¶ 43.) Plaintiff says he presented only a partial case because he felt pressured to help Lt. Barilar's wife, but that he thought the evidence he put forth would be sufficient for a finding of guilt. (*Id.*) District Justice Ford, suspecting the case was being fixed, was furious. (PSMF ¶ 44.) He stormed off the bench, then returned a few minutes later and dismissed Jennifer Barilar's citation. (PSMF ¶ 45.) Then District Justice Ford called Captain James Tripp, Plaintiff's troop commander. (PSMF ¶ 46.)

At this point, a description of the bureaucracy and discipline process at the PSP is necessary.

**Bureaucratic Structure of the PSP**

The head of the PSP is the Commissioner. (DSMF ¶ 1.) Below the Commissioner are several Deputy Commissioners, including the Deputy Commissioner of Administration. (*Id.*) The Deputy Commissioner of Administration oversees both the Bureau of Professional Responsibility (BPR) and the Department Discipline Office (DDO). (DSMF ¶ 2.) Within the BPR is the Internal Affairs Division (IAD). (DSMF ¶ 5.) The following individuals headed these departments during Plaintiff's tenure at the PSP:

3

>PSP Commissioner: Col. Paul Evanko
>Deputy Commissioner of Administration: Lt. Col. Hawthorne Conley
>Department Discipline Office: Capt. Robert B. "Barry" Titler
>Bureau of Professional Responsibility: Major W. John Pudliner
>Internal Affairs Division: Captain John R. "Rick" Brown

(DSMF ¶ 6.) At the time this lawsuit was filed, Col. Jeffrey B. Miller was PSP Commissioner, and Lt. Cynthia L. Transue was the Deputy Commissioner of Administration.

**Discipline Process at the PSP**

When the PSP receives a report of misconduct, a PSP member makes a log of it on Form PSP1-101. (DSMF ¶ 8.) The Form goes to the troop commander, then to BPR, then to IAD. (*Id.*) IAD decides whether to conduct an administrative investigation. (DSMF ¶ 9.) If there is a criminal investigation into the misconduct, the administrative investigation is put on hold pending the resolution of the criminal investigation. (DSMF ¶ 12.) Following the administrative investigation, the IAD investigator submits a report to BPR. (DSMF ¶ 10.) BPR reviews the report for accuracy and completeness and sends it to the PSP member's supervisor. (*Id.*) If, as in this case, the PSP member is a patrol officer, then the troop commander receives the report. (*Id.*)

Once the troop commander (the supervisor in this case) has the report, he holds a pre-disciplinary conference with the member accused of misconduct. (DSMF ¶ 14.) At this conference, the member looks at the allegations and can request further investigation. (*Id.*)

After the pre-disciplinary conference, the supervisor (here, the troop commander) adjudicates the case by deciding whether the alleged misconduct occurred. (DSMF ¶ 11.) The adjudicator can (1) sustain the allegation if there is enough evidence supporting misconduct; (2) not sustain the allegation if the evidence is insufficient; or (3) find the allegation unfounded. (*Id.*)

If the troop commander sustains the allegation, he has a choice of two disciplinary routes:

4

(1) "sustain and counsel" for a minor violation; or (2) issue a disciplinary action report (DAR) for a more serious violation. (DSMF ¶¶ 16-17.) The PSP member has to acknowledge receipt of the DAR. (DSMF ¶ 17.) The DAR, along with a supplemental report, goes to BPR, and then to the DDO for the penalty decision. (*Id.*)

The DDO determines which PSP rules were violated and looks at penalties typically imposed for similar violations. (DSMF ¶ 20.) The DDO then decides whether the violation is serious enough for the case to be considered a court-martial case. (DSMF ¶ 21.) If it is a court-martial case, the DDO recommends a penalty and sends the case up to the Deputy Commissioner of Administration for approval. (*Id.*) Once the final penalty is imposed, the PSP member can grieve the decision. Grievance proceedings take place before a neutral arbitrator.

<u>Discipline resulting from the Barilar Incident</u>

After Jennifer Barilar's summary trial, District Judge Ford complained to Capt. Tripp that Plaintiff had manipulated the proceedings. (DSMF ¶ 50.) Capt. Tripp submitted Form PSP1-101 to BPR. (*Id.*) BPR sent the matter to IAD for a criminal investigation. (DSMF ¶ 51.) The District Attorney of Clearfield County granted Plaintiff immunity and interviewed him about Lt. Barilar.[2] (*Id.*)

Lt. Barilar was charged with Intimidation of Witness and Obstruction of the Administration of Justice. (DSMF ¶ 53.) Plaintiff testified at Lt. Barilar's preliminary hearing.[3] (DSMF ¶ 54.) Plaintiff's testimony contradicted his earlier statement to the D.A. (*Id.*) The District Justice dismissed the case. (DSMF ¶ 55.)

---

[2] This is protected speech on which Plaintiff bases his First Amendment retaliation claim.
[3] This is protected speech on which Plaintiff bases his First Amendment retaliation claim.

IAD conducted an administrative investigation into both Plaintiff and Lt. Barilar. (DSMF ¶ 56.) The investigative report went to Plaintiff and Lt. Barilar's supervisors. (DSMF ¶ 62.) Lt. Barilar's supervisor decided to sustain and counsel. (DSMF ¶ 62.) Plaintiff's supervisor, Capt. Tripp, sustained the allegations and issued DAR 2001-42. (DSMF ¶ 63.) Plaintiff ultimately received a penalty of two days suspension without pay and did not grieve the decision. (DSMF ¶ 64.) Lt. Harrison at DDO issued the discipline, but Capt. Titler was involved in the decision. (PSMF ¶ 68; Def.'s Reply to PSMF ¶ 68.)

**UniMart Incident**

On April 1, 2001, Plaintiff allegedly entered a UniMart in an intoxicated state and asked a female employee to show him her breasts. (PSMF ¶ 75.) One month later, on May 5, 2001 (the day after he received DAR 2001-42), Plaintiff allegedly propositioned a woman for sex in a DuBois UniMart, threatened to arrest her for prostitution when she refused, and reported her for being in possession of drugs. (PSMF ¶ 76.)

A criminal investigation followed the events of May 5, 2001. The April 2001 incident resulted in the following criminal charges against Plaintiff: summary offenses of Disorderly Conduct, Harassment, and Public Drunkenness. (DSMF ¶ 68.) The May 2001 incident resulted in the following criminal charges against Plaintiff: misdemeanor offenses of Official Oppression and Disorderly Conduct and a summary offense of Harassment. (DSMF ¶ 69.)

On September 7, 2001, Plaintiff appeared before District Judge Ford and, pursuant to a plea bargain, pled guilty to summary offenses of Harassment and Public Drunkenness and a misdemeanor offense of Disorderly Conduct. (DSMF ¶ 71.) The other charges were withdrawn, and Plaintiff was sentenced to one year probation. (*Id.*)

6

An administrative investigation into the UniMart incident then took place. Capt. Tripp sustained the allegations on December 10, 2001, and issued DAR 2001-131. (DSMF ¶ 74.) DDO determined that Plaintiff had violated the following PSP field regulations:

    1-1.03, Conformance to Laws
    1-1.02, Unbecoming Conduct
    1-1.22, Use of Alcohol – Off-duty
    1-1.82, Internal Investigations
    1-2.05, Competency
    1-1.35, Discrimination or Harassment

(DSMF ¶ 75.)

The Deputy Commissioner of Administration approved DDO's recommendation of court-martial. (DSMF ¶ 76.) The Commissioner authorized the court-martial and approved the penalty of dismissal. (*Id.*)

On January 24, 2002, Capt. Titler informed Capt. Tripp that Plaintiff would be dismissed. (DSMF ¶ 78.) Plaintiff was informed on February 2, 2002, that he would be suspended effective February 5, 2002, with dismissal recommended as the ultimate penalty.

Plaintiff filed a grievance on February 12, 2002. (DSMF ¶ 80.) On August 19, 2002, the Arbitrator issued an opinion upholding dismissal as the penalty, thereby finalizing Plaintiff's termination. (DSMF ¶ 89.)

### **Procedure**

This matter originally came before the Court on January 23, 2004, when Plaintiff, William T. Shugarts, filed a § 1983 claim against various members of the PSP, alleging that his termination violated his Constitutional rights (Doc. No. 1). On April 30, 2004, Defendants filed an Answer

(Doc. No. 3). Defendants filed a Motion for Summary Judgment on February 19, 2007, (Doc. No. 36). That motion is the subject of this memorandum opinion and order.

## Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for summary judgment. Summary judgment should be granted in favor of the movant where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The burden is on the movant to show there exists no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In reviewing the summary judgment record, the Court must "view the facts in the light most favorable to the nonmoving party." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

## DISCUSSION

### Plaintiff's claims on his termination are not barred by the two-year statute of limitations.

Plaintiff brought this claim under 42 U.S.C. § 1983, so it is subject to a two-year statute of limitations. 42 Pa.. C.S. § 5524; *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989). Since Plaintiff filed his complaint on January 23, 2004, a claim actionable under § 1983 must have arisen since January 23, 2002. In fact, Plaintiff has claimed that his termination was retaliation in violation of the First Amendment (Count I) and a denial of equal protection in violation of the Fourteenth Amendment (Count II) (Compl. 6).

The Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), included termination in its list of acts considered discrete in the employment context. This discrete act occurred within the limitations period. As Plaintiff explains,

> In 2002, as a supposed consequence of the Unimart incident in 2001, and the plea agreement which arose out of that incident, I was terminated, despite that even the most serious misconduct that could be construed from the plea agreement would not have warranted my termination.

(Pl.'s Resp. to Def.'s First Interrog. #2). In other words, Plaintiff believes that the PSP could only consider the guilty pleas in terminating him, that the plea agreement did not support termination, and that the real reason he was terminated was the Barilar incident. Plaintiff's claims on the termination are not time-barred.

Defendants argue that Plaintiff's claim is still time-barred because some of the events he references occurred before January 23, 2002. A claim cannot arise until something actionable has occurred. Defendants acknowledge that Plaintiff was terminated after January 23, 2002:

> [T]he only time for which Shugarts can make his claims of retaliation under the First Amendment or of Equal Protection under the Fourteenth Amendment, is the time *after* January 23, 2002. Yet, no specific claim is made during this time frame *other than an allegation that he was suspended without pay on February 2, 2002, and was thereafter terminated.*

(Def.'s Br. 5 (second emphasis added)). The decision to terminate actually is the very event that the Court understands Plaintiff to be basing his claims on.

Plaintiff can also sue the individuals who decided to terminate him even though they acted before January 23, 2002. Plaintiff's claim on his termination did not arise until, at the earliest, February 5, 2002.[4] Plaintiff cannot sue Capt. Tripp for issuing a DAR in retaliation, since that would

---

[4]Plaintiff's termination may have happened as late as August 19, 2002, the date of the arbitration award. According to Capt. Brown, termination was not final until the end of the grievance process:

Pending the arbitration hearing . . . they're suspended without pay, but they're not off of our payroll. I mean,

9

be time-barred, but he can sue Tripp for his termination. Defendants cannot insulate the entire state police from suit just because the responsibilities in terminating a PSP member are shared by several department heads.

The focus of Plaintiff's claim is the termination, but he does mention other acts outside the limitations period.

> In the months following my traffic stop of Jennifer Barilar, I was subjected to lowered job evaluations in the form of two supervisory notations . . . I was also given satisfactory or below satisfactory ratings, despite that my performance merited ratings of "above satisfactory." Also, Sgt. Steingrabe denied me overtime hours for radar duty, which I was entitled to on the basis of my work performance, including my issuing of a high number of traffic citations. I was subjected to three BPR investigations on the basis of trumped up charges . . . I was subjected to false accusations that I had "thrown" the case of Jennifer Barilar, and I was subsequently disciplined . . . I was subjected to unwarranted scrutiny and harassment after my wife filed a PFA [Protection From Abuse] petition against me.

(Pl.'s Answer to First Interrog. #2; *see also* PSMF ¶¶ 71-74; Compl. 6.) All of these acts of retaliation occurred outside the limitations period. They are time-barred.

### Claims against Defendant Miller are not barred by *Ex Parte Young*.

Defendants' argument that the Eleventh Amendment protects Defendant Miller from suit is without merit. Plaintiff has sued Col. Jeffrey B. Miller in his official capacity. The Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908), read an exception into the Eleventh Amendment for actions seeking prospective or injunctive relief for ongoing violations of federal law. Plaintiff is seeking reinstatement, which is the sort of relief covered by the *Ex parte Young* exception. *See Koslow v. Commonwealth of Pa.*, 302 F.3d 161, 179 (3d Cir. 2002). ("Koslow's claim for reinstatement, with

---

they're not getting paid, but they're still considered a member of the Department until the hearing process is over. And once the arbitrator makes that decision and says, hey, the grievance is denied, they prove their case, from that day forward, you're terminated.
Brown Dep. 75:12-22.

10

accommodations for his disability, is the type of injunctive, "forward-looking" relief cognizable under *Ex parte Young*.") Miller is therefore a proper Defendant in this case.

## Claims against Defendant Transue are dismissed because she did not have personal involvement in Plaintiff's termination.

The Court agrees with Defendants that Cynthia Transue should not be subject to Plaintiff's claims because the most Plaintiff can say about her involvement is that she supervised Titler. PSMF ¶ 10. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Court believes the claims against Defendant Transue do amount to *respondeat superior*. She is not an appropriate defendant in this civil rights claim.

## No genuine issue of material fact supports Plaintiff's claim that his termination was in retaliation for his exercise of free speech.

Plaintiff claims to have suffered numerous acts of retaliation for his participation in the Barilar investigation. A retaliatory act can be quite small, as trivial as not holding a birthday party for an employee. *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990). Plaintiff's termination is a serious event, and if it was retaliation for Plaintiff's protected speech then § 1983 affords him relief.

To survive summary judgment on a First Amendment retaliation claim in the employment context, an employee must establish three elements:

> First, he must establish that his speech was protected. Second, he must demonstrate that he suffered some adverse employment action by his employer. Next, he must prove that his protected speech was a substantial or motivating factor for the adverse employment action.

11

*Matsey v. Westmoreland Cty.*, 185 Fed. App'x 126, 132 (3d Cir. 2006). If the employee does show that his protected speech was a substantial or motivating factor, the burden shifts to the employer to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, the burden does not shift to the employer because Plaintiff has not established that his protected speech was a substantial or motivating factor.

The Court agrees with Plaintiff that his speech during the Barilar investigation was protected. To be protected, an employee's speech must be on a "matter of public concern." *Lynch v. City of Philadelphia*, 166 F. Supp. 2d 224, 229 (E.D. Pa. 2001). Plaintiff testified in a criminal proceeding pursuant to a subpoena, so his speech did rise to the level of public concern. *Pro v. Donatucci*, 81 F.3d 1283, 1290-91 (3d Cir. 1996) (finding it was a matter of public concern where a public employee appeared in court pursuant to a subpoena). Plaintiff's speech during the Barilar investigation was protected, so he has established the first element of a retaliation claim.

As for the second element, Plaintiff claims to have been terminated as a result of his protected speech. (Compl. 6.) Retaliatory termination is adverse action. Plaintiff has established the second element of his retaliation claim.

Plaintiff's retaliation claim fails on the third element because he has not raised any material issues of fact as to whether his conduct during the Barilar incident was a substantial or motivating factor in his termination. Plaintiff discusses the Barilar incident at length and his unfair treatment following it because it "properly illuminates the pretextual nature of Trooper Shugarts' improper termination." (Pl.'s Br. 11.) In fact, putting the Barilar and UniMart incidents side by side only highlights how much *worse* the UniMart incident was. If the Barilar incident was at all a

12

consideration in Plaintiff's firing, it must have been minuscule because it is dwarfed by the UniMart incident. Barilar was not a motivating factor. Plaintiff provided enough motivation with the UniMart incident alone.

An example of the sort of evidence that can establish retaliation as a substantial factor and preclude entry of summary judgment for a defendant is seen in *Suppan v. Dadonna*, 203 F.3d 228 (3d Cir. 2000). In *Suppan*, police officers brought a § 1983 claim arguing that they were not promoted because of their union and political affiliations. *Id.* at 230. The district court entered summary judgment in favor of defendants because defendants had made a decision not to promote anyone that year. *Id.* at 232. Third Circuit reversed because the "facts could lead a reasonable factfinder to conclude not only that defendants were biased against the plaintiffs because of their protected activities, but that they acted on that bias in the evaluation process, lowering plaintiffs' scores." *Id.* at 237. In *Suppan*, the record showed a "campaign of retaliatory harassment culminating in the retaliatory rankings." *Id.* at 234-5. Several defendants admitted to giving a plaintiff low scores because of his actions when he was the head of his union. *Id.* at 231. One of the defendants admitted to giving low scores because another defendant instructed him to. *Id.*

As seen in *Suppan*, there actually should be something in the record to support a plaintiff's claim that his protected speech was a substantial or motivating factor. Plaintiff attempts to infer such a conclusion by diminishing the severity of his conduct at the UniMart and focusing on Capt. Titler's use of discretion.

Plaintiff does not think the UniMart incident is as bad as it sounds because he has the inside scoop on his own guilty plea. Masterfully allocating responsibility elsewhere, Plaintiff blames various lawyers and the fact that he has children for the guilty plea:

13

> There were only two reasons that Trooper Shugarts pled guilty to the reduced charges, both of which were directly tied to the fact that he had two young children to support. First, his attorney, Cortez Bell III, had informed him that if he contested the charges he would not be able to return to work for at least the next ten months, as that was the current waiting time for criminal cases to come to trial in the Clearfield County Court of Common Pleas. Given his current suspension without pay, he was facing the prospect of being deprived of his earnings for almost a year. Second, he was told by the attorney for the Pennsylvania State Troopers Association that a plea of guilty to Disorderly Conduct-Misdemeanor 3 and Public Drunkenness-Summary would not constitute "just cause" for termination of his employment with PSP, and that he could therefore expect to be reinstated with the PSP. It was for these reasons only that he accepted the plea agreement offered by the District Attorney. Had he not been advised in this manner by his attorneys, he would not have accepted the plea agreement.[5]

(PSMF ¶79 (citations omitted).) The guilty plea is important not for its veracity but for how Plaintiff appeared in the disciplinary process after the UniMart incident. Obviously, if Plaintiff was not guilty of the criminal charges to which he pled guilty, he should not have pled guilty. But the question here at summary judgment is whether the decision to terminate him was motivated by his protected speech in the Barilar incident. Plaintiff has not shown that despite the criminal convictions on his record, the real motivating factor behind his termination was Barilar. Moreover, even if he had not pled guilty to criminal charges, he still would have faced discipline for no less than six violations of PSP regulations.

The other way Plaintiff wants to diminish UniMart is by arguing that the decision to terminate him should not have considered anything beyond the guilty plea. According to Plaintiff, the PSP has a "practice of limiting discipline regarding criminal charges to those charges where there has been a finding of guilt." (PSMF ¶ 81 (citing Conley Dep.).) The summary judgment record does not support this characterization of PSP policy:

---

[5] Capt. Titler commented that the lawyer who "gave [Trooper Shugarts] that advice was without question wrong." Titler Dep. 264: 5-6.

14

> Q: Isn't it the case that regardless of what the criminal charges are against a member, the State Police are not bound by disposition in the criminal case and can independently decide for themselves whether or not a member's actions are in contravention of State Police rules and regulations?
> A: Pretty much you're accurate there.

(Conley Dep. 99: 22-25 – 100: 1-5, Dec. 20, 2006.)

Instead, the record shows a PSP practice of bringing administrative charges that can be proven to an arbitrator. (*See* Titler Dep. 262-265, Dec. 19, 2005.) In an arbitration the standard of proof is clear and convincing evidence. (Def.'s Ex. II at 17.) So in a case where administrative violations have criminal counterparts, it is possible for a PSP member to be acquitted of criminal charges and also be found to have violated PSP regulations. (*See* Titler Dep. 262-265.) In this case, Plaintiff pled guilty to Public Drunkenness, so the arbitrator under the lesser standard of proof took that guilty plea as proof that Plaintiff violated 1-1.22, Use of Alcohol—Off-duty. (Def.'s Ex. II at 31.) The charges to which Plaintiff did not plead guilty had to be supported by clear and convincing evidence.

Plaintiff also focuses a great deal on Capt. Titler and his abuse of power. Although Lt. Harrison issued Plaintiff's discipline, Capt. Titler oversaw him. (PSMF ¶ 68; Def.'s Reply to PSMF ¶ 68.) Plaintiff complains about Capt. Titler playing favorites and finding mitigating circumstances for an officer he heard was a "good guy." Yet Plaintiff has not established that despite the serious charges against him, his not being considered a "good guy" was a substantial factor in his termination. Moreover, Capt. Titler's disciplinary decisions were subject to review. (*See, e.g.*, Titler Dep. 265: 13-16 (explaining how he recommended dismissal in the Unrue case but Commissioner authorized suspension).)

Plaintiff's "proof" of Capt. Titler's bias against him is weak at best. He wants the Court to

15

read a great deal into the fact that Capt. Titler knew about the Barilar incident. (PSMF ¶ 83 ("When Defendant Titler received the DAR, he was well aware of the prior incident regarding Shugarts and Barilar. 'Someone may have said something like isn't that the guy that was involved in Barilar[.]'" (quoting Titler Dep. at 247).) The Court does not see retaliatory motivation behind the mere fact of Capt. Titler's awareness.

Plaintiff even offers as evidence that Titler was out to punish him for Barilar the fact that "contrary to his normal practice, Defendant Titler did not contact Captain Tripp to see if there were any mitigating circumstances or to see what kind of trooper Shugarts was." (PSMF ¶ 84.) In other words, Plaintiff thinks he would have benefited from Titler consulting with the person who issued DAR 2001-131 after the UniMart incident. For purposes of summary judgment, Plaintiff has not shown that Capt. Titler was a major force behind his firing.

The grievance proceeding following the decision to terminate further shows that Plaintiff's protected speech was not a substantial factor in his termination. The Court could not find any mention of Plaintiff's protected speech in the arbitration opinion. The Arbitration opinion only mentions that Plaintiff had been disciplined twice before. (Def.'s Ex. II at 33.) This is what Plaintiff views as "a factor in the arbitrator upholding the penalty." (PSMF ¶ 88.) Of course one of those DARs was for the Barilar incident, but the purpose of mentioning prior discipline was to explain that the leap from suspension to termination was justified by the serious nature of the UniMart incident. (Def.'s Ex. II at 33.) The opinion of a neutral arbitrator upholding the termination without any mention of Barilar strongly suggests the original decision to terminate was prompted only by the UniMart incident.

It is easy for the Court to imagine Plaintiff being disliked and unfairly mistreated for how he handled the Barilar incident. But Plaintiff is now asking the Court to find nefarious motivation stemming from the Barilar incident somewhere in the thick morass of six PSP violations and a guilty plea to three criminal charges. Plaintiff has not shown his protected speech to be a substantial or motivating factor. Since he has not met his initial burden, the Court grants summary judgment on the First Amendment retaliation claim to Defendants.

## No genuine issue of material fact supports Plaintiff's claim that he was denied equal protection.

As an individual, Plaintiff can assert an equal protection claim as a "class of one." *Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000). Since he is not a member of a suspect class, any different treatment he experienced need only be rationally related to a legitimate state interest. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

Plaintiff first argues that no rational basis existed to terminate him because Capt. Tripp thought Capt. Titler was wrong to charge Plaintiff with three of the six violations in DAR 2001-131. (Pl.'s Br. 18.) It is Capt. Titler's responsibility to determine what PSP regulations have been violated once he receives a DAR. (DSMF ¶ 20.) Capt. Tripp's role in the process is to issue a DAR. (DSMF ¶ 17.) Capt. Tripp's differing opinion does not support a finding of no rational basis because it is irrelevant to this inquiry what the Troop C commander thinks about how the DDO director does his job.

Plaintiff further argues his termination was a denial of equal protection because other PSP members received lighter penalties for more serious offenses. Plaintiff has prepared a list of

17

disciplined PSP members he feels were similar to him and more favorably treated. (Pl.'s Br. 21-23.) The Court does not find it necessary to compare Plaintiff to these other members. Even assuming he is similarly situated to all of them and differently treated from all of them, Defendants have already shown a rational basis for Plaintiff's penalty of termination. That rational basis is the fact that the PSP found Plaintiff had violated six departmental regulations. It is not the role of this Court to say whether the PSP misapplied its own rules. The relevant inquiry is

> whether the defendants correctly understood the rules they were enforcing. *Olech* does not empower federal courts to review government actions for correctness. Rather, an *Olech*-type equal protection claim [i.e. a "class of one" claim] focuses on whether the official conduct was rationally related to the accomplishment of the work of their agency.

*Bizarro v. Miranda*, 394 F.3d 82, 88-89 (2d Cir. 2005). Here, the fact that the penalty was based on departmental rules precludes a finding of no rational basis. Although the Court's conclusion would be the same in the absence of any grievance proceedings, it is worth noting that a neutral arbitrator reviewed the UniMart incident and also found that termination was proper.

For the reasons discussed above, the Court finds that there exists no genuine issue of material fact as to either of Plaintiff's § 1983 claims. Therefore, **IT IS HEREBY ORDERED THAT** Defendants' Motion for Summary Judgment (Doc. No. 36) is **GRANTED.** Judgment shall be entered for all defendants.

BY THE COURT:

**September 29, 2009**

*[signature]*
**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**